RENDERED: MARCH 25, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0205-DGE

R. M. AND S. M.                                              APPELLANTS

V.                          ON REVIEW FROM COURT OF APPEALS
                         NOS. 2019-CA-0449 & 2019-CA-0450
                            HARRISON CIRCUIT COURT
                        NOS. 18-AD-00016 & 18-AD-00017

CABINET FOR HEALTH AND FAMILY                               APPELLEES
SERVICES, COMMONWEALTH OF
KENTUCKY; D. M., A MINOR CHILD;
AND V. C. M., A MINOR CHILD

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING</u>**

We granted discretionary review of the Court of Appeals' decision

affirming the trial court's order and judgment terminating the parental rights of

R.M., the mother, and S.M., the father, to their two boys, D.M. and V.C.M.

As in their appeal to the Court of Appeals, the parents urge reversal of

the trial court's order and judgment, arguing the trial court erred because (1)

the record reveals less than the substantial evidence required to prove that

termination was in the boys' best interests, (2) the state's Cabinet for Health

and Family Services failed to prove it made reasonable efforts to reunify the

family, and (3) the improper admission and consideration of another family

member's abuse unfairly prejudiced the parents' case.

The Court of Appeals considered these alleged errors and affirmed the trial court's order and judgment. We likewise affirm the Court of Appeals after a close review of the record.

## I. FACTUAL AND PROCEDURAL BACKGROUND

R.M., the mother, and S.M., the father, are the parents of two children, V.C.M. (now 15, boy) and D. M. (now 13, boy).[1] The family, ethnic Romani, left Romania in 2014, immigrating illegally into the United States through Mexico, initially settling in Arizona in 2014. Immigration officials in Arizona told the Parents to remain there under state supervision for the time being, releasing them with ankle monitors, and requiring the Parents to inform Immigration of any intent to leave the state.

The Parents then contacted a relative in Arizona, I.M. I.M. picked them up and allegedly promised to find the Parents employment, although that promise went unfulfilled. Instead, the Parents began panhandling with the Children for the next three months in Arizona. The Children were not enrolled in school, spending their time with the Parents panhandling instead. Without informing Immigration, the Parents left for Kentucky. In the company of two extended family units and purportedly looking for work, the families panhandled n a roving caravan, arriving in Kentucky by July 2014. Having not

---

[1] We identify the parents and children by initials to respect their privacy. For clarity, the party-parents together will be called "the Parents," their boys together will be called "the Children," and all together they may be referred to as "the family."

found or looked for regular employment, the family split from the caravan and found themselves in northern Kentucky.

Soon after arrival, the Parents were contacted by the Kentucky Cabinet for Health and Family Services ("the Cabinet") in Harrison County informing them that I.M. had been detained there and that his children had been removed from his custody. The Parents went to the Cabinet's Harrison County office seeking temporary custody of I.M.'s children. At some point during this meeting, Cabinet workers discovered the Parents had left their two boys in their vehicle outside for nearly two hours. This prompted a Cabinet worker, Warner, to petition for an emergency custody order (ECO), which was denied. After the Parents told Warner they were living out of their van, Warner told them they could not be considered for placement of I.M.'s children. Warner then called Arizona Immigration at the suggestion of the Parents themselves, who had just misrepresented to her that Immigration authorized their travel to Kentucky. Arizona Immigration confirmed to Warner that they were unaware of the Parents' travel to Kentucky.[2]

A second allegation of sexual abuse or endangerment of I.M.'s children was made against certain family members with whom the family continued to travel. The Cabinet petitioned again for an ECO to remove the Children from the Parents' custody, arguing their peculiarly close association with these traveling family members posed a serious risk of harm to the Children. A court

_____

[2] At some point, I.M. was deported back to Romania, while his wife and children remained in the United States voluntarily.

3

granted this petition and issued an ECO. But the Parents left Kentucky for Arizona before the Cabinet could intercede. Unable to find the Parents at the address S.M. provided, the Cabinet sent out a law-enforcement notice to locate the family. On their way through Amarillo, Texas, the Parents were detained by law enforcement. The Children were then returned to the Cabinet in Kentucky under the ECO and placed into foster care.

V.C.M. was about nine years old at the time and D.M. was about seven years old. The two were experiencing dental pain that required extensive dental work. It was at this point the Cabinet discovered the Children had been made to panhandle for and with their parents. Both children were also acting out sexually toward classmates and one another.[3] V.C.M. required eight months' therapy for his inappropriate sexual behaviors with other children. D.M. continued to exhibit aggression, stealing, and lying, requiring therapy and medication.

By 2015, the Parents, represented by counsel, stipulated to abuse or neglect of the Children. Reunification of the family was the Cabinet's initial goal. The Cabinet maintained contact with the Parents' private counsel in Arizona and with a social-services agency in Arizona in pursuit of reunification. The Cabinet developed a case plan for reunification that included the following initial steps: (1) cooperate with the Cabinet; (2) complete a parenting

---

[3] For instance, according to the trial court's order and as the Court of Appeals noted, the first foster mother "described the two boys repeatedly embracing, rubbing genitals, and 'French' kissing each other. The boys also 'humped' pillows." D.M. also apparently solicited others on the school bus to prostitute his child foster sister.

assessment; (3) complete a domestic-violence assessment; (4) obtain stable housing; (5) obtain stable, legal employment; and (6) resolve all legal and immigration issues. In the months that followed, the Cabinet received no confirmation of the Parents' efforts to meet these reunification conditions. For almost a full year, the Cabinet tried unsuccessfully to contact the Parents in Arizona. The Arizona family services' efforts to reach the Parents were also unsuccessful.

Eventually, the Cabinet regained contact with Parents through an Arizona family-services agency. It was not until the Cabinet sought to change the goal to adoption in 2016 that the Cabinet received any documentation of the Parents' efforts to satisfy the initial reunification conditions.

The Parents moved to Kentucky by November 2016, leasing an apartment in Kentucky. The Cabinet approved this housing, and the Parents paid rent until the eventual termination hearing. The Parents also obtained jobs in Kentucky, although neither of them verified valid work visas or permits; and this work was temporary and likely supplemental to their continued panhandling. The Parents had visitation with the Children by in-person contact and by phone, visitation which apparently continues to this day.

By September 2017, the trial court ordered the case goal be changed to adoption. A preliminary report from the UK CATS[4] clinic concluded the Parents appeared not to comprehend the high-risk parenting behaviors that led

---

[4] CATS is the "Comprehensive Assessment and Treatment Services" Project at the University of Kentucky Center on Trauma and Children. University of Kentucky Website, https://www.uky.edu/ctac/AboutUs (last visited 2/18/2021).

to the removal of the children, generally denying their nomadic, panhandling lifestyle was incompatible with child-rearing norms. Concerns lingered that steps the Parents had taken toward stability, like leasing the apartment and securing employment, were superficial and that they would revert with the Children to their nomadic lifestyle once they regained custody and the gaze of the Cabinet and trial court was lifted.

The trial court ordered an additional examination of the family by Dr. David Feinberg, a forensic psychologist. Dr. Feinberg concluded essentially the same things the UK CATS clinic, the Cabinet, and the trial court observed: the Parents appeared indifferent to the issues of neglect and high-risk behaviors, they seemed to obfuscate the circumstances and behaviors that led to removal, and they did not demonstrate a sincere willingness to change their behaviors. The trial court also concluded the parents persistently failed to be forthcoming with respect to their background, their work status, the legality of the work they obtained, the legality of their vehicle registration, and their lifestyle.

By March 2018, the Cabinet petitioned the trial court for involuntary termination of the Parents' parental rights ("TPR"). The trial court heard the TPR proceeding, a lengthy hearing spanning several days, in September 2018. The trial court issued its final orders terminating parental rights in January and February 2019.

The trial court expressed disapproval of how the case had been handled over the years and expressed concern that the Parents may not have been

6

given the fullest opportunity to comply with the Cabinet's terms or to make their case for reunification. Even so, the trial court ultimately ordered TPR. The Parents appealed, and the Court of Appeals affirmed the TPR order.

## II. ANALYSIS

### A. Standard of Review

In an appeal from a TPR order per KRS[5] 625.090, we determine whether the decision was supported by substantial evidence of record.[6] Substantial evidence is that which is sufficient to induce conviction in the mind of a reasonable person.[7] We will accept the trial court's findings of fact unless they are clearly erroneous.[8] Where the trial court's findings are not clearly erroneous, and they substantially support the TPR, we will affirm the order.[9] The termination of parental rights is a particularly fact-sensitive inquiry, so appellate courts are disinclined to disturb trial-court findings,[10] perhaps especially in a case like this where the facts are not seriously disputed.

---

[5] Kentucky Revised Statutes.

[6] *M.A.B. v. Commonwealth Cabinet for Health and Family Services*, 456 S.W.3d 407, 411 (Ky. 2015).

[7] *Id.*

[8] Rules of Civil Procedure (CR) 52.01 ("Findings of fact, shall not be set aside unless clearly erroneous . . . .").

[9] *See M.A.B.*, at 411.

[10] *Cabinet for Health and Family Services v. K.H.*, 423 S.W.3d 204, 211 (Ky. 2014).

7

**B. Involuntary Termination of Parental Rights**

The right of every parent to raise his or her own child is a fundamental right of utmost constitutional concern.[11] While the Commonwealth of Kentucky may deprive a parent of this right when the circumstances require, KRS 625.090 ensures this right is protected by measures of due process. Namely, the statute establishes three substantive elements necessary for TPR, all of which the Commonwealth must prove by clear and convincing evidence, (a) starting with a finding of abuse or neglect by the parents, (b) then determining that TPR is in the child's best interest, and finally (c) that any one of the grounds for termination listed in KRS 625.090(2)(a)–(j) exists.

We are satisfied that substantial evidence of abuse and neglect supports the trial court's decision in the present case. We will elaborate below in discussing the best interests of the Children, but that finding satisfies the first substantive element under KRS 625.090. As to the third substantive element, we agree with the Court of Appeals, that substantial evidence proves at least one of the statutory grounds for termination under KRS 625.090(2)(a)–(k). Namely, that for six months the Parents continuously or repeatedly failed to provide or were substantially incapable of providing essential parental care and protection to the Children and that there was not an expectation of improvement in that regard.[12] Additionally or alternatively, the Children had

---

[11] *K.H.*, 423 S.W.3d at 209. *See Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972) (protecting a parent's right to control the rearing, education, and religion of his or her child); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (holding the right to raise a child is a "basic civil right" of a parent).

[12] KRS 625.090(2)(e).

been in foster care for fifteen of the forty-eight months before the filing of the TPR petition.[13]

The crux of the Parents' argument is that TPR was not in the best interests of the Children under KRS 625.090(1)(c) because of the Cabinet's alleged failure to pursue reasonable efforts at reunification and because evidence of another family member's abuse was improperly admitted and considered against them.  Under KRS 625.090(3), these are issues to consider regarding a child's best interest, so we will discuss and resolve them accordingly, collapsing them under our best-interest analysis.[14]

As to all the Parents' claims of error, we must ultimately reject them. The trial court, as noted by the Court of Appeals, devoted several pages to meticulous findings to support its conclusion TPR was in the Children's best interests.  Nothing in this record gives us reason to think the trial court's findings were clearly erroneous.  We affirm the Court of Appeals in that regard and address each relevant issue in turn.

## C. Substantial evidence supports the conclusion that TPR was in the Children's best interests.

In determining the best interest of a child, the trial court considers six enumerated factors under KRS 625.090(3)(a)–(f).[15]  Since there is no suggestion

---

[13] KRS 625.090(2)(j).

[14] R.M. and S.M. raise their "reasonable efforts at reunification" argument under KRS 625.090(c) as if it were a distinct part of the analysis.  Just as a matter of organization, we consider that argument as one of the six factors under this "best interest" prong of KRS 625.090(c), as the statute requires.

[15] The factors under KRS 625.090(3) include, paraphrasing:

(a) whether the parents suffer from a mental illness or disability;

of record that the Parents suffer from mental illness or disability per subsection (3)(a), our review begins with whether there was evidence of abuse or neglect per subsection (3)(b).

### 1. *Abuse or Neglect*

The Children suffered from abuse or neglect. The Parents stipulated to this from the outset and while represented by counsel, and the trial court made an independent finding of abuse and neglect that is supported by substantial evidence. There was also substantial evidence that the Parents continued to misunderstand their neglect. The Parents exhibited such an unawareness or unwillingness to commit to changing the more glaring neglectful conditions, as found by both Dr. Feinberg and at the UK CATS clinic, that the trial court had justifiable reason to believe that abuse or neglect would continue after reunification.

The Parents' neglect became evident as early as the July 2014 incident when the Parents left the Children outside in a hot van while they met with the Cabinet in Harrison County, an apparently normal practice within the rootless extended-family caravan with which they traveled. This might arguably have

---

(b) acts of abuse or neglect toward any child in the family;

(c) if the child was placed with the Cabinet, whether the Cabinet has, prior to filing of the petition, made reasonable efforts to reunite the parent and child through its services;

(d) the parents have established circumstances amenable to child-rearing such that the best interest of the child is to be with the parent;

(e) the physical, emotional, and mental health of the child and the prospects for improvement while in the parent's care; and

(f) "the payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so"

10

been regarded as a minor or isolated incident, which explains a judge's denial of the first ECO petition. But the Parents continued to maintain dishonestly, from the time of this incident until their most recent evaluations, that the Children were in the car for just a couple minutes, not for the two hours they were obviously locked in the car.

Further, the Parents continued their transient lifestyle, unchanged since their arrival in America. One can readily infer from the evidence this will not end. While the family traveled across the country purportedly looking for work, in violation of restrictions from Arizona Immigration, the Children were not enrolled in any school or otherwise receiving an education. They did not have stable shelter, but instead lived out of a van. No evidence indicated the Parents intended to settle into a more stable living situation. What was more concerning is that during this time the Children were made to panhandle. While the Parents disputed it, the Children's testimony indicated they were told they would not eat if they did not produce funds by panhandling.[16] It was suggested in oral argument that having the Children panhandle was a form of human trafficking under federal standards. Here, too, the Parents equivocated about these facts when questioned, telling stories materially inconsistent with one another and with the Children's accounts.

---

[16] It is worth noting that the clinical assessments of the families revealed this was not unheard of for the leaders of similar bands to deploy women and children to panhandle in parks and streets, to spread out strategically to cover more ground unsupervised, and to bring in their take at the end of the day.

11

Soon after being placed in foster care at a very young age, seven and nine, the Children exhibited painful tooth decay that required extensive treatment. They also engaged in problematic sexual behavior. Of particular concern was the seven-year-old D.M.'s acting out by attempting to prostitute his foster sister to others on a school bus. For a child so young to have understood this transactional concept was more troubling considering the Cabinet's worry the Children, if not victims themselves, had been exposed to sexual abuse or forms of trafficking through the extended family, I.M. in particular. Similarly, the boys had other difficulties conforming to age-appropriate sexual norms, such as being undressed completely in Cabinet-facilitated visits with the parents, and even behaving sexually toward each other and their peers.

Finally, the Parents underwent a domestic-violence assessment as part of the Cabinet's terms of reunification. Following his assessment, R.M. was required to complete 36 domestic-violence classes, although both parents maintained they did not understand why it was necessary for R.M. to complete them. They had documentation purportedly confirming that they completed the classes conducted in Spanish, a language in which the Parents were not fluent. But this documentation was also suspect, bearing identical wording that Cabinet-employee Warner claimed did not address the domestic-violence concerns the Cabinet forwarded to the appropriate Arizona agency. These facts indicate participation in these classes, assuming it occurred, was most likely

superficial. The Parents continue to deny or misunderstand the purpose of these classes.

The Parents' continuing nonchalant and apparently oblivious reaction to the above concerns was the final fact that substantially supported the TPR. Dr. Feinberg came to the same conclusion as the trial court—the Parents failed to acknowledge convincingly the problematic evidence of abuse or neglect of the Children as they entered foster care in 2014.

We, therefore, affirm the finding of the courts below that abuse and neglect was proven by substantial evidence. This finding supports the conclusion that TPR was in the Children's best interests and, as we stated above, this finding simultaneously satisfies the first element for TPR under KRS 625.090.

At this point it makes sense to address another of the Parents' main arguments on appeal: that the evidence of abuse by I.M., a family member and consistent fellow traveler, was unduly prejudicial as being wrongly imputed to the Parents. They argue this evidence allegedly tainted the trial court's impression of the Parents' fitness to maintain custody.

The family's travel company was an important consideration in this case. It was notable that the Parents and Children traveled closely and consistently with these extended family members, including the accused, I.M., and his children, in a convoy. They all subsisted by panhandling together with the children in the extended family. At least at the time the Parents were traveling with this family and considering how vulnerable the Children were when they

13

were so traveling, evidence of sexual and physical abuse by the other families was relevant to the degree of risk posed to the Children.

Regardless of whether the Parents knew of the abuse of other children within the extended family or took appropriate precautions to protect their own Children, we presume the trial court was able to comprehend the fact that the allegations of sex abuse were made specifically against I.M. and assessed the risk to the Children accordingly. We find no basis to believe the trial court improperly or mistakenly attributed I.M.'s abuse to the Parents in an unfairly prejudicial way, so we find no error in admitting it for consideration. But even if this evidence was more directly prejudicial to the Parents, there was substantial and sufficient evidence of the Parents' own abuse and neglect independent of I.M.'s abuses. Accordingly, we hold any arguable error in admitting I.M.'s abuse would not have affected the outcome of the TPR order anyway, so admitting the evidence would have been harmless error at most.[17] We affirm the Court of Appeals on this issue as well.

### 2. The Cabinet's Efforts at Reunification and the Parents' Resistance.

When the Commonwealth takes custody of a child, it must undertake efforts to reunify the family as are appropriate and reasonable under the circumstances.[18] Reasonable efforts are defined as "the exercise of ordinary diligence and care by the department to utilize all preventative and

---

[17] *See* CR 61.01 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

[18] *See K.H.*, 423 S.W.3d at 212.

reunification services available which are necessary to enable the child to safely live at home[].”[19]  KRS 625.090(4) states that "[i]f the child has been placed with the Cabinet, the parent may present testimony concerning the reunification services offered by the Cabinet and whether additional services would be likely to bring about lasting parental adjustment enabling a return of the Child to parent."  Similarly considered in the Children's interests is the extent of a parent's efforts to establishing arrangements amenable to reunification and child-rearing.[20]  In this case, those matters intersect, so we analyze them together.

The Parents argue that the Cabinet did not exhaust all options over the four-year period the Cabinet controlled custody of the Children.  For the first two years, the Parents were unable to leave Arizona to come back to Kentucky, apparently due to restrictions on their movement by Immigration.  The Parents' own behavior contributed to this problem as the Cabinet and the Arizona family services had trouble finding the Parents because they failed to give reliable contact information or were consistently roving without a consistent point of contact.  Regardless, the Parents were evidently not deliberate about maintaining a method of contact.  While some temporary delay in communication may be expected given the distance between Kentucky and Arizona, that the Parents went months without contacting the Cabinet indicates a lack of attention on the Parents' part, not the Cabinet's.  Further,

---

[19] KRS 620.020(13).

[20] KRS 625.090.

15

the Parents apparently did not begin to follow their case plan in Arizona for nearly a year, even though the Cabinet had contacted the Parents' private counsel and gave counsel a list of conditions to satisfy. Again, this delay does not demonstrate a diligent, conscientious effort to pursue reunification. At some point, the extent of the Cabinet's efforts cannot be blamed for the delay.

The fact remains that the trial court itself extended the fact-finding and goal-setting process for over two years, allowing ample opportunity for the Parents to show progress toward reunification. Tellingly, the trial court stated:

> "[E]very opportunity has been afforded to these parents to attempt to make progress toward resolving the problems that led to removal. Despite the extended period that this child has been in care, there has been only superficial effort to take advantage of services offered. Throughout this case, the Court has been concerned about the cultural and language issues that have made this case challenging. This Court has allowed this case to linger without permanency for the sole purpose of determining whether the parents have been offered a meaningful opportunity to correct the problems and reestablish a connection with the children. However, these parents have not been candid in their dealings with the Court."

The 2017 consultations by the UK CATS program and by Dr. Feinberg simply confirmed that after four years trying to work with them the Parents still did not accept the gravity and nature of the behavior that led to the initial removal. Instead, they persistently dodged and prevaricated. None of the several services provided or attempted to be provided by the Cabinet made the desired impression on the Parents.

Between the efforts put forth by the Cabinet and the generous extensions of time allowed by the trial court, the trial court's findings of reasonable efforts

16

at reunification were supported by substantial evidence. This factor weighs against a finding that reunification was in the Children's interests.

The Parents' efforts over the four-year period between separation and the TPR order amount to submitting to a psychological exam, completing a required domestic-violence class in a non-native or non-fluent language, reestablishing compliance with Immigration authorities, eventually obtaining an apartment in Kentucky, which the trial court had reason to find superficial and temporary, and completing the UK CATS and Feinberg assessments. Notably, these were the threshold terms for reunification. But a demonstration that the Parents internalized the need for change for the Children's sake remained, as the trial court observed, to be seen. In fact, the Parents maintained at the latest stage of these proceedings that they did not abuse or neglect the Children at all, described their situation in an overly positive manner, and unequivocally denied wrongdoing. While the Parents did show up to some of the required courses and assessments, it took them years to do so. These efforts were minimal threshold steps, and the results did not support reunification. The substantial evidence under this factor weighed against the Parents.

### 3. *Physical, Emotional, and Mental Well-being of Children*

The trial court found against the Parents on this factor. Notably, the Children consistently expressed a desire to be reunited with their parents, a desire the Parents similarly expressed. The Parents argue their separation will be traumatic for the Children, who have such affection for their parents.

17

But the trial court recognized the Children's remarkable improvement, physically, mentally, and socially since entering foster care and undergoing treatment. Dr. Feinberg thought TPR was in the Children's best interests, noting the value of permanency and stability to a developing child as demonstrated by the Children since their removal. This was a major consideration, especially considering the unmitigated concerns the Parents would likely continue their former practices. The future wellbeing of the children if reunified with the Parents was only made more doubtful by the Parents' consistent denial at all stages of the proceedings. Substantial evidence in the record supported the trial court's finding that the Children's well-being would be best preserved by TPR.

### 4. *No Financial Contribution from Parents in Child-Rearing*

A parent's financial contribution, if they can make it, to a child's upbringing while in substitute custody is also considered in the best-interest analysis. Here, the Parents did not contribute anything to the Children's upbringing after separation, other than occasional gifts and some food they brought to periodic visits. The Parents did not otherwise contribute toward the Children's boarding, schooling, food, or other expenses. We are mindful that the Parents came to the United States as illegal immigrants in 2014 but note from the record the lack of any effort at financial support of the Children while in foster care, and the lack of an explanation for why a substantial contribution toward support was not forthcoming.

### III. CONCLUSION

This case presented a difficult decision given the acknowledged cultural barriers and the Children's express wishes to return to the Parents, but the trial court correctly found TPR in the Children's best interests. The trial court's ruling is amply supported by substantial evidence under KRS 625.090. Accordingly, we affirm the Court of Appeals' holding.

All sitting. All concur.

COUNSEL FOR APPELLANTS:

William J. Verax, IV
John Lair Law Offices

COUNSEL FOR APPELLEES, CABINET FOR HEALTH AND FAMILY SERVICES, COMMONWEALTH OF KENTUCKY:

Leslie Marie Laupp
Tiffany Lorraine Yahr

COUNSEL FOR APPELLEES, D. M., A MINOR CHILD AND V. C. M., A MINOR CHILD:

John Roger Kleinschmidt, III