RENDERED:  JANUARY 3, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0433-ME


S.D.O.                                                                APPELLANT



|  | APPEAL FROM BARREN CIRCUIT COURT |
|---|---|
| v. | HONORABLE MICA WOOD PENCE, JUDGE |
|  | ACTION NO. 23-AD-00049 |



CABINET FOR HEALTH AND
FAMILY SERVICES,
COMMONWEALTH OF KENTUCKY;
K.M.D.; AND Z.G.O., A MINOR
CHILD                                                  APPELLEES


### OPINION
### AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, A. JONES, AND TAYLOR, JUDGES.

JONES, A., JUDGE:  S.D.O. ("Mother") brings this appeal from the Barren Circuit Court's order terminating her parental rights to her one minor child, Z.G.O. ("Child").  Following careful review of the record, and all applicable law, we affirm.

## I. BACKGROUND

Child, a male, was born in early April 2020 to Mother and K.M.D. ("Father").[1] Late the next month, the Cabinet initiated the first of three DNA[2] proceedings against Mother following allegations of domestic violence and environmental concerns.

Mother was a victim of domestic violence by Father, who threw her onto a couch and attempted to suffocate her with a pillow while Child was present. Following the incident, Mother fled the home with Child and was advised by dispatch not to return. Despite this advice, she returned to the home with Child. When officers arrived, they found the home in a deplorable condition and observed a large dog overtaking Child. The Cabinet obtained emergency custody of Child on May 26, 2020, and temporary custody on June 3, 2020.

During the first DNA proceeding, Mother stipulated to dependency and was ordered to comply with her case plan to facilitate Child's return to her care. Mother successfully completed her case plan to the Cabinet's initial

---

[1] Father's parental rights were also terminated as a result of this action. However, Father has not appealed or entered an appearance in this matter, despite being named as an appellee. This Opinion considers only the propriety of the circuit court's termination of Mother's parental rights. Father is mentioned only insomuch as is necessary to place this matter in the proper factual and procedural context.

[2] Dependency/Neglect or Abuse.

satisfaction, and Child was returned to her on August 7, 2021, with the condition that Mother does not permit Child to have contact with Father.

Thirteen days later, during a routine home visit, Father was found hiding under a bed at Mother's house. As a result, Child was again removed from Mother's care after the Cabinet filed a second DNA petition. Mother was ordered to complete another case plan. Although this case plan did not explicitly prohibit Child's contact with Father, the district court's September 3, 2021, removal order specified that such contact was not permitted.

Mother successfully completed her case plan in the second DNA action, and Child was returned to her on January 25, 2022. However, Child's return was short-lived. On April 21, 2022, the Cabinet removed Child for the third and final time after Father was observed pushing Child in a stroller without Mother present. Another DNA action was filed, and a third case plan was developed for Mother. Although Mother substantially completed this case plan, the Cabinet ultimately changed its permanency goal to termination, concluding that Mother was unable to accept responsibility for her actions or appropriately interact with Child. On August 29, 2023, the Cabinet filed a petition to terminate Mother's parental rights.

The family court held an evidentiary hearing on February 4, 2024. Testimony was provided by Mother as well as numerous other witnesses, including social workers, therapists, and family members.

Amy Baird, a licensed psychological practitioner, testified that she conducted various assessments and evaluations of both Mother and Father. Her goal was to understand Mother's functioning, mental health, background, personality traits, parenting expectations, discipline techniques, and related factors. Ms. Baird concluded that several of Mother's assessment scores were either invalid or required cautious interpretation. She opined that Mother was exaggerating symptoms, minimizing issues, or attempting to present herself in an overly positive light by offering socially desirable responses and denying negative traits – even basic denials of common behaviors that most people would acknowledge.

Despite these concerns, Ms. Baird obtained what she believed to be a valid result on the parent-child relationship assessment. This assessment indicated that Mother had adequate levels of social and emotional support, found pleasure in parenting, demonstrated knowledge of effective communication, and appropriately disciplined Child.

Aundi Thomas, Child's therapist and facilitator of family therapy sessions between Mother and Child, also testified. Child was referred to Ms. Thomas due to experiencing "night terrors" and his exposure to domestic violence.

Additionally, Child's foster mother reported that he exhibited abnormal separation anxiety when she attempted to leave him at daycare. Ms. Thomas testified that while Child made progress under her care, some of his issues persisted.

Of particular concern, Ms. Thomas noted that Mother's interactions with Child during therapy raised questions about her ability to parent effectively. Specifically, she observed that Mother did not praise Child or initiate affection. Ms. Thomas also found it troubling that Child displayed an "aggressive" play style when interacting with Mother. Furthermore, Ms. Thomas testified that Mother was unable or unwilling to acknowledge her role in Child's removal, instead attributing it solely to Father's acts of domestic violence. Mother downplayed concerns about her parenting style and discipline. Ultimately, Ms. Thomas ceased family therapy after Mother requested it be discontinued.

Brooke Muse, currently a supervisor for the Cabinet, testified next. At the time of Child's third removal, Ms. Muse was the family's ongoing social worker and continued in that role until January 2023. She oversaw case planning with Mother, whose plan required her to complete a mental health assessment, a BRASS assessment, parenting classes, and to work with UK TAP. Ms. Muse testified that Mother was not fully forthcoming during these assessments. For instance, at her BRASS appointment, Mother reported no history of domestic violence, despite the fact that this case originated due to domestic violence

concerns. Additionally, Mother did not take responsibility for Child's removal and did not understand why he was placed in foster care.

The family's current ongoing social worker, Briana Brooks, also testified. Ms. Brooks stated that Mother was not permitted to allow other individuals, including her family and current boyfriend, to be present during her visitation with Child. However, Mother frequently took Child to GameStop, where her boyfriend worked, and visited with her family while Child was with her. Otherwise, Mother had complied with her third case plan.

Despite this compliance, Ms. Brooks testified that it was unrealistic for Child to be successfully returned to Mother's care. She based her opinion on Mother's assessment results, which showed that Mother did not fully accept responsibility for her actions and was not completely honest. Ms. Brooks also noted that Mother's history demonstrated a pattern of poor decision-making regarding Child's welfare, which had directly led to two subsequent removals after Child was first returned to her. Ms. Brooks believed that Child was better off remaining with his foster family. She testified that Child had made significant progress in foster care, was stable, and was thriving in his current placement. According to Ms. Brooks, Child was bonded to his foster family, who could meet his needs and provide him with the stability and structure he required.

Mother testified in her own defense. She stated that she has her own home, where Child has his own bedroom equipped with everything he needs. Since Child's last removal, Mother testified that she has not had contact with Father. She admitted that her relationship with Father was abusive and explained that she did not leave the relationship sooner because she did not want to tear the family apart. According to Mother, she has learned from her past mistakes and has, on her own initiative, created a "safety plan." She testified that this plan outlines the steps she would take if she ever found herself in another unsafe domestic situation.

Mother also discussed her case plans with the Cabinet. She acknowledged that, despite case planning with the Cabinet on three separate occasions, she only recently began taking the process seriously. Once she did, she found individual therapy to be the most beneficial aspect of her plans. She explained that through therapy, she learned to recognize relationship "red flags" and how trauma can result from abusive relationships. She also testified that she now understands how experiencing trauma, such as domestic violence, can impact one's mindset and decision-making.

However, Mother did not find family therapy with Ms. Thomas helpful. She testified that Ms. Thomas did not provide her with feedback, despite her requests, and that she did not believe Ms. Thomas's goal was to reunite her

with Child. According to Mother, Ms. Thomas indicated that the purpose of therapy was to create a safe environment for Mother to say goodbye to Child after her parental rights had been terminated.

The family court entered its order terminating Mother's and Father's parental rights on March 4, 2024. This appeal by Mother followed.

## II. ANALYSIS

KRS[3] 625.090 sets forth the requirements which must be met before a court in Kentucky can involuntarily terminate a parent's rights to her child. First, as it concerns these appeals, the family court must determine that the child is an abused or neglected child or that the child was previously determined to be an abused or neglected child by a court of competent jurisdiction. KRS 625.090(1)(a)1.-2. Second, a petition seeking the termination of parental rights must have been filed by the Cabinet pursuant to KRS 620.180 or 625.050. KRS 625.090(1)(b). Third, the family court must find that termination is in the best interest of the child. KRS 625.090(1)(c). Finally, the family court must find by clear and convincing evidence the existence of one or more of the eleven grounds (a) through (k) listed in KRS 625.090(2).

---

[3] Kentucky Revised Statutes.

Pursuant to KRS 625.090(3), the family court must consider certain

factors in determining the best interest of the child and the existence of a ground

for termination. They are as follows:

> (a) Mental illness as defined by KRS 202A.011(9), or an intellectual disability as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time;
>
> (b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family;
>
> (c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court;
>
> (d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;
>
> (e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and
>
> (f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.

*Id*.

Even where all the requirements for termination are met, the family court may choose in its discretion not to terminate a parent's parental rights if the parent has established by a preponderance of the evidence that the child will not continue to be an abused or neglected child if returned to the parent. KRS 625.090(5). However, this section is not a mandate. It is, as the statute plainly states, entirely discretionary.

Termination of parental rights cases are tried in private hearings before the family court. KRS 625.080(1). After the hearing, the family court is required to make findings of fact and conclusions of law supporting its decision on the termination petition. *Id.* "Broad discretion is afforded to [family] courts to determine whether parental rights should be terminated, and our review is limited to a clearly erroneous standard." *Cabinet for Health and Family Services v. H.L.O.*, 621 S.W.3d 452, 462 (Ky. 2021).

Factual findings which are supported by substantial evidence of record are not clearly erroneous. *R.M. v. Cabinet for Health and Family Services*, 620 S.W.3d 32, 37 (Ky. 2021). "Substantial evidence is that which is sufficient to induce conviction in the mind of a reasonable person." *Id.* "When the findings are supported by substantial evidence, then appellate review is limited to whether the facts support the legal conclusions which we review *de novo*. If the [family] court's factual findings are not clearly erroneous and the legal conclusions are

correct, we are limited to determining whether the [family] court abused its discretion in applying the law to the facts." *H.L.O.*, 621 S.W.3d at 462 (citations omitted).

Mother's primary argument is that the family court abused its discretion in terminating her parental rights. She argues that while all elements are to be considered, some deserve different weight than others, *e.g.*, Mother's ability to provide stable housing and employment over Child's removal more than two times in a twenty-four-month period. Mother provides no case law to support her proposition. And moreover, the family court has wide discretion in terminating parental rights. *Cabinet for Health and Family Services v. K.H.*, 423 S.W.3d 204, 211 (Ky. 2014).

Mother previously stipulated to neglect during the prior DNA proceedings. Her stipulation satisfies KRS 625.090(1)(a). Therefore, the first requirement of the termination is satisfied. Furthermore, while KRS 625.090(2) lists eleven separate termination grounds, the family court need only find one to support termination. In this case, the family court determined that subsections (e), (g), (j), and (k) were present. Here, it is beyond dispute that Child was removed three times during a twenty-four-month period, which satisfies subsection (j). As such, we need not evaluate the family court's findings under the other three

subsections. Suffice it say, there was substantial evidence to support the family court's findings under all four subsections.

We now turn to KRS 625.090(1)(c), which requires the family court to find termination to be in the child's best interest. Child had a tumultuous start to life having experienced a serious episode of domestic violence when he was just a few months old. This led to his removal. While we recognize that Mother was also a victim of this domestic violence, this fact does not excuse her future conduct. When Mother regained custody, she was ordered not to allow Father to have contact with Child. Yet, within a matter of just a few days of regaining custody, Mother allowed Father to return to the family's home where she was living with Child. This led to a second removal. A second return and a third removal followed.

There can be no doubt that the series of removals and returns had a detrimental impact on Child and has impacted his well-being as demonstrated by his anxiety and night terrors. While Mother has made some strides towards improvement of her situation as demonstrated by her testimony, it is far from clear that Child would be safe if returned to her care. The testimony indicated that Mother continued to downplay the role she played in Child's removals. Perhaps more troubling, Mother continued to exercise poor decision making during her visitations by taking Child to see her family and boyfriend without first requesting

permission to do so in violation of her case plan. Ms. Thomas's testimony supported that Mother also had difficulty initiating affection towards Child and disciplining him appropriately.

Mother received a bevy of services during her extensive case planning history. While Mother made progress over time, she still continued to display questionable decision making and an overall lack of good parenting skills. Child is in desperate need of long-term structure and stability. While Mother made some limited progress, it was not sufficient to demonstrate that any reunification with Mother would be lasting. In contrast, Child was placed with the same foster family each time he was removed and at the time of the hearing he was still with that family. The testimony indicated Child was bonded to his foster family and was doing well. While we have no doubt that Mother does love Child and desires to parent him, we must agree with the family court that the factors support termination being in Child's best interest.

Mother's final argument concerns the sufficiency of the Cabinet's reunification efforts. Mother argues the Cabinet did not use reasonable efforts to reunite her with Child under KRS 625.090(3)(c). As previously discussed, whether or not the Cabinet provided "reasonable efforts" to reunite the child with the parent is one of the factors that a court must consider in determining the best interests of the child under KRS 625.090(3). Pursuant to KRS 620.020(13),

"[r]easonable efforts" means "the exercise of ordinary diligence and care by the department to utilize all preventive and reunification services available to the community . . . which are necessary to enable the child to safely live at home[.]" "Reunification services" is defined to include "remedial and preventive services which are designed to strengthen the family unit, to secure reunification of the family and child where appropriate, as quickly as practicable, and to prevent the future removal of the child from the family." KRS 620.020(14).

Mother asserts that the family therapy she engaged in with Ms. Thomas was not actually designed to bring about reunification but rather was aimed at allowing Child to say goodbye to Mother in a safe environment. She also notes that the Cabinet objected when she sought additional time with Child.

The key word is *reasonable*. The Cabinet need not place Mother's interests ahead of Child's interests or require its service providers to recommend reunification where they do not believe it is in the child's best interest to do so. The Cabinet provided Mother with a variety of services over an extended period of time. Notwithstanding the many services provided, at the end of the day, Mother still failed to appreciate the seriousness of her actions and failed to show good judgment while caring for Child. Multiple witnesses testified that while she acknowledged Child was placed in a risk of harm, she did not appreciate her role in the matter. Based on Mother's history, it was entirely reasonable for the Cabinet

to conclude it had nothing more it could offer Mother that would be likely to bring about a timely reunification between Mother and Child. Accordingly, we cannot agree with Mother that the family court erred in its consideration of this factor.

## III. CONCLUSION

For the foregoing reasons, we affirm the Barren family court's termination of Mother's parental rights.

ALL CONCUR.

BRIEF FOR APPELLANT:

Ronald L. Hampton
Glasgow, Kentucky

BRIEF FOR APPELLEE CABINET
FOR HEALTH AND FAMILY
SERVICES, COMMONWEALTH OF
KENTUCKY:

Dilissa G. Milburn
Mayfield, Kentucky