CABINET FOR HEALTH AND FAMILY SERVICES, Commonwealth of Kentucky, Appellant

v.

K.H., Sr., Appellee.

No. 2013–SC–000127–DGE.

Supreme Court of Kentucky.

Feb. 20, 2014.

G. Thomas Mercer, Frankfort, Erika Saylor, Sarah Mahan Steele, Counsel for Appellant.

Bethanni E. Forbush–Moss, Louisville, Counsel for Appellee.

Opinion of the Court by Justice CUNNINGHAM.

Appellee, K.H., Sr., a resident of Cincinnati, Ohio, is the natural parent of Kenny,[1] a thirteen-year-old boy as of the date of this opinion. Kenny, along with his three half siblings, lived in Louisville, Kentucky with their biological mother. On June 24, 2009, the Cabinet for Health and Family Services ("Cabinet") conducted a "routine home visit" after discovering that the children's mother had been arrested for public intoxication and disorderly conduct. The home visit disclosed that the four children had been unsupervised for an extended length of time. Consequently, the Cabinet obtained an Emergency Custody Order removing Kenny and his siblings from their mother's care.[2] On June 26, 2009, the Cabinet brought forth a Dependency, Neglect and Abuse action ("DNA") in the Jefferson Family Court. A temporary removal hearing was held three days later. Despite being notified, Appellee did not attend the hearing. After determining that there were no relatives who could care for Kenny, the family court awarded custody to the Cabinet.

Several pretrial hearings in the DNA action were held in 2009, only one of which Appellee attended. On August 19, 2009, Appellee was appointed counsel. On October 7, 2009, Kenny's mother stipulated that she abused or neglected her children, including Kenny. A dispositional hearing was held on November 4, 2009, during which time the family court committed Kenny to the Cabinet. The family court specifically found that there were no less restrictive alternatives to returning Kenny to his mother because the "child has extensive emotional, mental/psychological needs which mother cannot meet." In addition, visitation with Kenny was limited to "supervised/therapeutic visits."

On April 19, 2010, the family court reconsidered its previous visitation order and denied a modification. In formulating its conclusion, the family court discussed at length Kenny's severe emotional trauma and significant developmental delays. Shortly after being placed in a foster home, for example, Kenny's foster parents reported that he displayed aggression and

---

**1.** A pseudonym is being used to protect the anonymity of the child.

**2.** Appellee is not the biological father of the siblings removed.

inappropriate sexual behavior towards others. Of particular concern, Kenny threatened to commit suicide. As a result, Kenny endured a five-week, inpatient hospitalization for psychiatric treatment at Wellstone Psychiatric Hospital. As the family court summarized, Kenny was "diagnosed with attachment disorder, RAD (Reactive Attachment Disorder), sexual abuse, post-traumatic stress disorder (PTSD), ADHD (Attention Deficit Hyperactivity Disorder), and neglect[.]" After being released from Wellstone, Kenny was placed in a therapeutic foster home as an only child.

On June 23, 2010, the Cabinet held a facilitated staff meeting to discuss Kenny's progress and goals. Appellee appeared at the meeting. The staffing report stated that Appellee "was at present unable and unwilling to take custody of child, resides in Cincinnati and has no contact with the child." The Cabinet also noted that, since his placement in the therapeutic foster home, Kenny had benefited from counseling and a school formulated Individualized Education Plan ("IEP"). Kenny's mental health had improved, along with his grades and general disposition. In addition, Kenny's foster parents expressed interest in adopting him. For these reasons, the Cabinet determined that the goal of permanency would be changed from reunification to adoption.

Due to the Cabinet's changed permanency goal, Appellee and Kenny's mother filed separate motions to obtain custody of Kenny. On June 29, 2010, a hearing was held to discuss the motions. The family court denied both motions, stating the following as it specifically pertained to Appellee:

> [Appellee] acknowledged he did not come to court for pretrial hearing or at least 7 other dates. He had car problems, etc. Last saw [Kenny] in December '09. Tried to call attorney 6 times with no call backs. Motion for return is denied. Father has no understanding of [Kenny's] behavioral issues or need for treatment.

On April 12, 2011, the Cabinet filed a petition to involuntarily terminate the parental rights ("TPR") of Appellee and Kenny's mother. The TPR action was tried before the family court on February 10, 2012. Sara Morrison, Kenny's case worker, was the Cabinet's sole witness. Ms. Morrison inherited the case from her predecessor, Cassandra Taylor, in November of 2010. Ms. Morrison's testimony indicated that a case plan was formulated every six months for a total of six case plans. Appellee was not present at any of the case plan meetings. However, Ms. Morrison testified that she corresponded with Appellee through numerous letters and telephone conversations to ensure that he was aware of the case plan goals and tasks. As of January 2011, Appellee's case plan required him to pay child support and provide proof of such payments, attend counseling with the child, and contact the Cabinet in order for it to assess what services Appellee would benefit from, if any.

In July of 2011, the Cabinet modified Kenny's case plan due to Appellee's interest in obtaining custody. Ms. Morrison testified that, in addition to the previous requirements of the January 2011 case plan, Appellee was also required to obtain a substance abuse evaluation, maintain contact with the Cabinet twice per month, and initiate supervised phone conversations with Kenny twice per week. Appellee was also to provide Ms. Morrison with proof of a safe and stable home environment. Ms. Morrison informed Appellee of specific documentation that would satisfy the Cabinet's request, including a certified copy of Appellee's criminal background check, a letter from his employer stating

his wages and the length of his continued employment, proof of home ownership or lease, and proof of payment of utilities. Ms. Morrison testified that, with the exception of the occasional phone call to Kenny, Appellee failed to comply with the case plan in all other respects.

Appellee also testified during the trial. Appellee claimed that he was unaware of the case plans. Appellee also claimed that child support payments were deducted from his paychecks. In regards to his living arrangements, Appellee stated that he was "in between homes" and temporarily living with his grandparents. Finally, Appellee testified that he had no knowledge of Kenny's emotional, psychological, and educational needs.

On February 23, 2012, the family court terminated the parental rights of Appellee and Kenny's biological mother. Considerable findings of fact and conclusions of law were formulated in the family court's opinion. Appellee subsequently appealed the judgment on the following two grounds: (1) there was not substantial evidence to support the family court's finding of abuse and neglect; and (2) termination was not in Kenny's best interest. Kenny's mother did not appeal the termination order.

The Court of Appeals agreed with Appellee and reversed the family court's judgment. *K.H., Sr. v. Cabinet for Health and Family Services*, No. 2012–CA–000582–ME, 2013 WL 275684 (Ky.App. Jan. 25, 2013). The Court of Appeals explained that Appellee was entitled to have an independent determination that Kenny was an abused or neglected child as specific to Appellee's conduct and not based on the mother's abuse or neglect. *Id.* at *10. Moreover, the Court of Appeals stated that "[i]t appears that the mother's stipulation of abuse and neglect has impermissibly spilled over to the father, whose behavior must be adjudged separately and apart

from that of the mother." *Id.* Finally, the Court of Appeals determined that the family court lacked substantial evidence to support its finding that terminating Appellee's rights was in Kenny's best interest. The case was remanded to the family court for further proceedings. This Court granted discretionary review.

### *Involuntary Termination of Parental Rights*

The involuntary termination of parental rights is a scrupulous undertaking that is of the utmost constitutional concern. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 119–20, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The U.S. Supreme Court has unequivocally held that a parent has a "fundamental liberty interest" in the care and custody of his or her child. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). This fundamental interest "does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . ." *Id.* at 754–55, 102 S.Ct. 1388. Therefore, "[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Id.*

The Commonwealth's TPR statute, found in KRS 625.090, attempts to ensure that parents receive the appropriate amount of due process protections. KRS 625.090 provides for a tripartite test which allows for parental rights to be involuntarily terminated only upon a finding, based on clear and convincing evidence, that the following three prongs are satisfied: (1) the child is found or has been adjudged to be an abused or neglected child as defined in KRS 600.020(1); (2) termination of the parent's rights is in the child's best interests; and (3) at least one of the termination grounds enumerated in KRS 625.090(2)(a)-(j) exists.

### Individualized Finding of
### Abuse or Neglect

The first issue before the Court is whether the family court was required to make an independent finding, not based on the mother's previous stipulation, that Appellee abused or neglected Kenny. This inquiry is a matter of statutory interpretation. Consequently, we must look to the plain language of the statute which, if unambiguous, is controlling. *White v. Check Holders, Inc.,* 996 S.W.2d 496, 497 (Ky.1999). KRS 625.090(1), in pertinent part, states the following:

> The Circuit Court may involuntarily terminate all parental rights *of a parent* of a named child, if the Circuit Court finds from the pleadings and by clear and convincing evidence that ... [t]he child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), by a court of competent jurisdiction; [or] ... [t]he child is found to be an abused or neglected child, as defined in KRS 600.020(1), by the Circuit Court in this proceeding....

(Emphasis added). From this excerpt, it appears that the statute contemplates the termination of a single parent's rights. While we tend to agree with the Cabinet that an adjudication of neglect or abuse relates to the status of the child and not the parent, further analysis suggests that both parents must be afforded individualized determinations. For example, the statute also states:

> Upon the conclusion of proof and argument of counsel, the Circuit Court shall enter findings of fact, conclusions of law, and a decision *as to each parent-respondent* within thirty (30) days either: (a) Terminating the right of the parent; or (b) Dismissing the petition and stating whether the child shall be returned to the parent or shall remain in the custody of the state.

KRS 625.090(6) (emphasis added). This statutory language clearly mandates that the trial court must find that each parent satisfies the three prongs found in the TPR statute, including whether the child qualifies as an abused or neglected child. In addition, we note that this Court just recently stated, albeit in dicta, that KRS 625.090 requires the court to make a finding of abuse or neglect as to each parent. *D.G.R. v. Commonwealth, Cabinet for Health and Family Services,* 364 S.W.3d 106, 114 (Ky.2012).

Unquestionably, there will often times be situations where the court can infer the joint responsibility of parents for the neglect or abuse of the child. *See, e.g., C.J.M. v. Cabinet for Health and Family Services,* 389 S.W.3d 155, 160 (Ky.App. 2012) (after testing positive for marijuana at birth, the court found both parents abused or neglected the child since they both admitted that they had used marijuana before and during the mother's pregnancy). Yet, unlike those situations in which due process allows for both parents to be treated as a unit, the case presently before us concerns separated parents who did not even live within the same state. Accordingly, in this particular situation, the family court could not involuntarily terminate Appellee's parental rights unless, by clear and convincing evidence, it was found that *he* had neglected or abused Kenny.

### Sufficiency of the Evidence

Having held that the family court must make separate findings of abuse or neglect as to each parent, in addition to the other two prongs of the TPR statute, we must now determine whether the trial court, in fact, made such findings. Our review is focused solely on the first and second prongs of the TPR statute—whether the actions of Appellee rendered Kenny an

abused or neglected child and whether it was in Kenny's best interest for Appellee's parental rights to be terminated. KRS 625.090(a)-(b).

■ To begin, we note that the trial court has wide discretion in terminating parental rights. *Cabinet for Health and Family Services v. T.N.H.*, 302 S.W.3d 658, 663 (Ky.2010) (citing *K.R.L. v. P.A.C.*, 210 S.W.3d 183, 187 (Ky.App.2006)). Thus, our review is limited to a clearly erroneous standard which focuses on whether the family court's order of termination was based on clear and convincing evidence. Kentucky Rules of Civil Procedure ("CR") 52.01. "Pursuant to this standard, an appellate court is obligated to give a great deal of deference to the family court's findings and should not interfere with those findings unless the record is devoid of substantial evidence to support them." *T.N H.*, 302 S.W.3d at 663. Due to the fact that "termination decisions are so factually sensitive, appellate courts are generally loathe to reverse them, regardless of the outcome." *D.G.R.*, 364 S.W.3d at 113. With these standards in mind, we turn to the TPR statutory requirements.

### Abused or Neglected Child

■ Focusing on the first statutory prong of KRS 625.090, we disagree with the Court of Appeals that the family court failed to make a specific finding that Appellee abused or neglected Kenny. During the hearing, the family court stated the following: "The court finds that there has been testimony in this case concerning [Appellee] that the child is found to be abused or neglected by this circuit court." Moreover, in its written findings of fact and conclusions of law, the family court stated that "[Kenny] is found *in this proceeding* to be abused or neglected as defined in KRS 600.020(1)." (Emphasis added). The family court's findings also

discussed the presence of three statutory qualifying events, as listed in KRS 600.020(1), which rendered Kenny an abused or neglected child.

First, the family court found that *both* parents repeatedly failed or refused to provide Kenny with "essential parental care and protection." KRS 600.020(1)(a)4. This conclusion was supported by the family court's findings that "[a]lthough [Appellee] did maintain phone contact with this child, he ha[d] not seen [Kenny] since the child's removal from the Respondent mother's custody in June of 2009. . . ." This finding is substantiated by the Cabinet's records and Appellee's own testimony. It was not clearly erroneous for the family court to conclude that Appellee's minimal contact with Kenny failed to qualify as the requisite care and protection necessitated by KRS 600.020(1)(a)4.

Secondly, the family court concluded that *both* parents, "for reasons other than poverty alone, have continuously or repeatedly failed to provide or are incapable of providing essential food, clothing, shelter, medical care or education." KRS 600.020(1)(a)8. Testimony of both Appellee and Ms. Morrison exposed the fact that, despite repeated requests, Appellee would not provide the Cabinet with proof that he maintained a stable and safe home. In addition, Appellee refused to provide documentation that he had a steady job or that he was making child support payments. In regards to education, Appellee was unaware of what school Kenny attended or his educational difficulties. Appellee also admitted that he refused to attend Kenny's IEP. Most importantly, Appellant had a very limited understanding of Kenny's psychological needs and had not participated in any counseling with his child. As the family court noted, Appellee was "[un]able to describe how he might seek continued treatment for [Kenny's] diagnoses." We

believe this evidence was substantial enough to support the family court's findings.

Lastly, the family court found that, while Kenny was in foster care for fifteen of the most recent twenty-two months preceding the TPR action, Appellee had failed to make sufficient progress towards obtaining custody or visitation. KRS 600.020(1)(a)9. Evidence at trial revealed that Ms. Morrison had numerous conversations with Appellee concerning tasks he could perform to possibly gain custody of his son. Appellee, however, failed to complete even the simplest of tasks, such as providing proof of his income or child support payments. As a result, it was not clearly erroneous for the family court to conclude that Appellee failed to make any progress, let alone sufficient progress, in obtaining visitation or custody.

For the aforementioned reasons, we find that the family court not only made a particularized finding that Kenny was an abused or neglected child specifically as it related to Appellee's actions, but that there was also substantial evidence in the record to support its conclusion. The family court did not abuse its discretion in ruling that the first prong of KRS 625.090 was met.

### Best Interest of Child

In conducting a best interest analysis, a trial court must consider the six factors enumerated in KRS 625.090(3)(a)-(f). While the family court's written order did not specifically address each factor, its findings lead us to believe that each factor was properly considered. *See D.G.R.,* 364 S.W.3d at 115. In addition, for the sake of brevity, we will not discuss the factors listed in KRS 625.090(3)(a), (b) or (f). To this Court's knowledge, there has been no evidence presented to indicate that Appellee suffered from a mental illness or intellectual disability. Further-

more, the preceding sections of this opinion have already addressed the court's findings relating to acts of abuse or neglect and Appellee's child support payments. As a result, we will focus on the factors listed in KRS 625.090(3)(c)-(e).

### Reasonable Efforts

■ KRS 625.090(3)(c) requires the court to consider "whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents[.]" In the family court's opinion, the Cabinet "rendered or attempted to render all reasonable services to the Respondent parents that might be expected to bring about a reunion of the family." Again, we find that there was substantial evidence in the record to support the family court's findings.

Reasonable efforts are defined by KRS 620.020(11) as "the exercise of ordinary diligence and care by the department to utilize all preventive and reunification services available ... which are necessary to enable the child to safely live at home[.]" The Cabinet offered Appellee opportunities to comply with the case plan, to seek visitation with his son, and to be involved in his therapy. When asked what services could have been further supplied to Appellee, Ms. Morrison stated none that she knew of since Appellee would not contact the Cabinet nor obtain a substance abuse evaluation. Basically, the Cabinet was without information to properly gauge what reunification services were needed.

The Court of Appeals' opinion rests on the presumption that the Cabinet only attempted to make reasonable efforts after the goal of permanency changed to adoption. Trial testimony indicates that this inference may or may not be accurate. Therefore, we believe this fact is a credibility issue clearly within the discretion of

the trial judge. CR 52.01. Nevertheless, regardless of the permanency goal, Appellee still failed to perform the required tasks leading up to the Cabinet's April 12, 2011 TPR petition. KRS 625.090(3)(c) focuses only on the Cabinet's efforts *prior* to the TPR petition, irrespective of the permanency goals.

Moreover, we ponder what services the Cabinet could have offered Appellee to encourage him to comply with the minimum requirements of his case plan. We doubt there is a service or program which would have induced Appellee into supplying easy to obtain documentation furthering the likelihood of him obtaining custody of his son. Thusly, the family court did not abuse its discretion in holding that the Cabinet made reasonable efforts to reunite Appellee with his son prior to the filing of the TPR petition.

### Physical, Emotional, and Mental Health of Child

 KRS 625.090(3)(e) is another factor the trial court must consider when conducting a best interest analysis. This factor takes into account the child's physical, emotional, and mental health coupled with whether improvement will continue if termination is ordered. In considering Kenny's emotional and mental health, we must acknowledge Kenny's dire mental condition when he was removed from his mother's custody at the tender age of eight. As stated, the family court found that Kenny suffered from attachment disorder, sexual abuse, PTSD, ADHD, and neglect. Kenny's mental health was so frail that he threatened to commit suicide by stabbing himself. Kenny only showed improvement after being hospitalized for five weeks. Kenny also read on a kindergarten level, displayed overtly-sexualized behavior, defecated on the floor when angry, and was aggressive towards others.

Since his placement with his current foster family, Kenny has made vast improvements, both academically and psychologically. During the trial, Ms. Morrison testified that Kenny no longer displayed sexualized or aggressive behavior. He has received counseling to deal with his many mental diagnoses. Kenny has also benefited from special classes which have dramatically improved his grades. Based on this evidence, we believe the trial court had substantial evidence to support its finding that the Cabinet had met his "physical, emotional and mental health needs ... and the prospects are for greater improvement in the child's welfare if termination is ordered."

### Appellee's Efforts and Adjustments

 Lastly, the family court was required to consider the "efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child." KRS 625.090(3)(d). During the trial, Appellee failed to show any steps he had taken in the previous two years which would make it in Kenny's best interest for Appellee to obtain custody. For those reasons, the trial court determined "that there was no reasonable expectation of improvement in Appellee's conduct in the immediately foreseeable future." We cannot find that the family court was clearly erroneous in this determination.

Without regurgitating our prior analysis, we once again note the failure of Appellee to obtain and supply proof of a stable and safe home. Appellee had over two years to secure an environment suitable for Kenny to reside in. Unfortunately, Appellee could not supply the Cabinet with such evidence. Furthermore, despite being provided with the information in April of

2010, Appellant failed to educate himself regarding Kenny's considerable psychological diagnoses. Appellee was also unaware of the amount of therapy needed to ensure Kenny's well-being. In effect, Appellee failed to formulate a plan to ensure that his child would continue to receive counseling and treatment.

To conclude, the family court's factual findings were supported by substantial evidence. The family court did not abuse its discretion in ruling that the termination of Appellee's parental rights was in Kenny's best interest.

### Court of Appeals' Opinion

Lastly, it is incumbent upon this Court to address the Court of Appeals' opinion and what we believe to be mischaracterizations of the case against Appellee. For example, the Court of Appeals opined that very little evidence was offered against Appellee and that "the trial court's order ... is mostly silent as to any actions or inactions by [Appellee]." *K.H., Sr.,* 2013 WL 275684, *10. This depiction of the case is plainly incorrect. Notwithstanding the fact that the evidence against the mother was overwhelming, the Cabinet spent an equal amount of time presenting testimony and proof against Appellee. In fact, the Cabinet's sole witness, Ms. Morrison, discussed the conduct of both parents in almost equivalent amounts. Appellee's counsel cross-examined Ms. Morrison for approximately forty-five minutes and Appellee was on the stand for approximately one hour. In fact, the family court's written findings of fact and conclusions of law extensively discussed Appellee's actions and progress, or lack thereof.

### Conclusion

In summation, we believe the family court made individualized findings that Appellee neglected or abused Kenny as de-

fined by KRS 600.020(1). The family court's findings were also amply supported by substantial evidence sufficient to meet the three-part test as found in KRS 625.090. Moreover, Appellee has failed to show that the family court abused its discretion in terminating Appellee's parental rights. For these reasons, we reverse the opinion of the Court of Appeals and hereby affirm the Jefferson Family Court's order terminating Appellee's parental rights.

All sitting. All concur.