RENDERED: APRIL 29, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2020-SC-0276-DGE

CABINET FOR HEALTH AND FAMILY
SERVICES, COMMONWEALTH OF
KENTUCKY; AND E.R.-L.O., A MINOR
CHILD

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2019-CA-0685
LETCHER CIRCUIT COURT NO. 18-AD-00019

H.L.O.

APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>REVERSING AND REINSTATING</u>**

The Letcher Circuit Court found H.L.O. neglected her daughter E.R.-L.O. and terminated H.L.O.'s parental rights.[1] H.L.O. appealed, and a divided Court of Appeals reversed, holding that the circuit court was clearly erroneous in finding that termination was supported by clear and convincing evidence. The Cabinet for Health and Family Services (Cabinet) petitioned this Court for discretionary review, which we granted. After review, we reverse the Court of Appeals and reinstate the judgment of the Letcher Circuit Court.

---

[1] Due to the confidential nature of the proceedings, the mother, children, and fathers will be identified by their initials.

## BACKGROUND

H.L.O. is the mother of E.R.-L.O., T.J.C., and S.C.[2] E.R.-L.O. was born February 11, 2016, and tested positive for Buprenorphine. H.L.O. tested positive for Methamphetamine and Buprenorphine. On February 26, 2016, the Cabinet filed a Dependency, Neglect or Abuse (DNA) action against H.L.O. and J.H., and the district court granted the Cabinet emergency custody of E.R.-L.O., setting a temporary removal hearing for March 1, 2016.

At the temporary removal hearing, the district court ordered that E.R.-L.O. be placed in the temporary custody of the Cabinet. The court found that H.L.O. had stipulated to neglect, abuse, and dependency concerning E.R.-L.O. The district court ordered that the Cabinet explore potential relative placements and that H.L.O. enroll in the Advancing Solutions program. Additionally, the court and Cabinet were operating on the assumption that J.H. was E.R.-L.O.'s biological father. As such, J.H. was ordered to comply with drug screenings and pill counts by the Cabinet.

At the April 26, 2016 adjudication hearing, H.L.O. again stipulated to neglect and abuse of E.R.-L.O., and the district court ordered that E.R.-L.O. remain in the custody of the Cabinet. The Letcher County Attorney filed a motion for child support from H.L.O. and J.H. It was in response to this motion for support that J.H. first denied being E.R.-L.O.'s biological father. The district

---

[2] All three children have different fathers. The two older children, T.J.C. (born 2008) and S.C. (born 2011), were placed with family members rather than in foster care. For this reason, E.R.-L.O. is the only child subject to this termination proceeding.

court ordered DNA testing to establish paternity, but J.H. refused to comply, and it was May 2018 before testing conclusively eliminated J.H. as the biological father and identified T.J.R. as E.R.-L.O.'s father.

On August 29, 2016, the district court ordered that H.L.O. be permitted unsupervised visitation with E.R.-L.O. after hearing testimony from the Cabinet's case worker, Jay King. The court ordered H.L.O. to pay child support in the amount of $100 per month beginning September 1, 2016, and to provide health insurance if she could afford to do so at a reasonable cost or through an employer. At the subsequent custody review on November 15, 2016, Mr. King stated that H.L.O. had been struggling with services, had tested positive for Percocet use, was arrested for public intoxication during a visitation at the Cabinet's office, and was later arrested for shoplifting after another visitation session. The December 8, 2016 order set a permanent custody hearing for early 2017.

Before that permanent custody hearing, the interested party review board recommended that E.R.-L.O. remain with her current foster family and that the goal for E.R.-L.O. be changed to adoption for the child's stability. The district court held the permanency hearing on March 7, 2017, and Mr. King testified that H.L.O. had experienced a setback in her program and had tested positive for drugs. Specifically, H.L.O. tested positive on twenty (20) of her twenty-eight (28) drug screens principally due to using Suboxone without a prescription while participating in the Advancing Solutions program. In addition, H.L.O. had to restart Phase I of the program due to a positive test for

3

Percocet. Mr. King testified that H.L.O.'s visits with E.R.-L.O. generally went well. Still, H.L.O. attended one visit while under the influence of a substance resulting in criminal charges and incarceration. On March 27, 2017, the court entered an amended order changing E.R.-L.O.'s permanency plan to adoption and directing all reunification efforts to cease.

On July 27, 2017, H.L.O., through counsel, filed a motion to redocket the case. She had recently obtained temporary custody of T.J.C. and wanted to regain custody of all of her children under the Cabinet's supervision. There is no indication in the record that the district court ruled on this motion. At its April 2018 annual permanency review, the Cabinet continued to recommend that the goal for E.R.-L.O. be adoption. The district court accepted this recommendation in an order dated April 9, 2018, and further ordered DNA testing to definitively identify E.R.-L.O.'s father. Subsequent DNA tests filed with the district court ruled out J.H. and established that T.J.R. was E.R.-L.O.'s biological father.

On May 8, 2018, more than a year after E.R.-L.O.'s change in permanency goal, the Cabinet filed a petition to terminate the parental rights (TPR) of both H.L.O. and T.J.R. A warning order attorney was appointed for T.J.R., and the court dismissed J.H. as a party. The warning order attorney filed a report on November 17, 2018, stating that he had mailed T.J.R. a letter regarding the action, but T.J.R. had not responded to the notice.

The court held an evidentiary hearing on the Cabinet's TPR petition on February 1, 2019. The Cabinet called Mr. King as its first witness. Mr. King

4

was H.L.O.'s case worker. He discussed the initial referral to the Cabinet in February 2016 and the Cabinet's subsequent efforts at reunification. Mr. King confirmed E.R.-L.O. had never been released into H.L.O.'s care. He then summarized H.L.O.'s participation in the services offered by the Cabinet, specifically the University of Kentucky Targeted Assessment Program (UK TAP) and the Advancing Solutions program. The plan required H.L.O. take random drug screens and maintain appropriate housing. He testified that H.L.O. took ten months to complete Phase 1 of the Advancing Solutions program due to the relapses she experienced. Mr. King also testified regarding H.L.O.'s boyfriend, J.H. Because the Cabinet originally believed J.H. was E.R.-L.O.'s father, J.H. was included in the order for drug screening. Mr. King stated that J.H. had refused to take any drug screenings. He never engaged in any services offered by the Cabinet.

Addressing the March 2017 goal change, Mr. King stated H.L.O. had not completed the program by that date and was still in Phase 1. Other factors preventing the return of E.R.-L.O. to her care included H.L.O.'s arrest for public intoxication at the Cabinet's office during one of her visitations, followed by her arrest for shoplifting after she left another appointment. Mr. King noted that H.L.O. had failed multiple drug screenings. She had almost always tested positive for Suboxone, procuring it on the street when she did not have a prescription. Mr. King also testified H.L.O. had issues with transportation, having only recently obtained a driver's license. Mr. King did state that he had no reservations regarding the cleanliness or order of her home.

5

When asked, Mr. King stated that, in his opinion, the Cabinet had made reasonable efforts to reunify the family before the district court changed the goal to adoption but acknowledged once the goal changed, those efforts had ceased. After the change in goal, H.L.O. completed the Advancing Solutions program, her UK TAP assessment, and the KVC Kentucky behavioral health and parenting program, but at the time of this hearing, E.R.-L.O. had been in the Cabinet's care for 35 months. Mr. King stated he believed H.L.O. had been incapable of providing for E.R.-L.O.'s essential care and protection. He detailed H.L.O.'s criminal past, including her March 2015 conviction for second-degree wanton endangerment when she and J.H. passed out in a car with S.C. also in the car, as well as her theft charges. Mr. King stated he believed that her pattern of drug abuse rendered her incapable of providing for E.R.-L.O., noting that she had experienced several relapses.[3] He also stated that it took her ten months to complete Phase 1 of the Advancing Solutions program and between sixteen (16) and seventeen (17) months to complete the entire program.

As to whether H.L.O. provided necessities for E.R.-L.O., Mr. King said H.L.O. attended regular, weekly supervised visits at the Cabinet's office. She generally brought food or clothing for E.R.-L.O. While she brought items to the visits, H.L.O. was more than $1,300 in arrears on her support payments

---

[3] We have made an effort throughout this opinion to accurately portray the testimony as contained in the record. To be scientifically accurate, a substance-use disorder, if it exists, is characterized by a pattern of symptoms resulting from the use of a substance that the user continues to take, despite experiencing problems as a result. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 5th Edition, DSM–5 (2013).

despite a relatively modest obligation of $100 per month. H.L.O. was currently not working, and when asked about her source of income, Mr. King mentioned her relationship with J.H. In the last six months, H.L.O. admitted to the Cabinet she still had a relationship with him but had told Mr. King that J.H. did not live with her. Mr. King stated J.H. was under a no-contact order with regard to S.C. In August 2016, as a sign of her progress, H.L.O. had been granted unsupervised visitation with E.R.-L.O. But the change was short lived when Cabinet staff saw J.H. in a van with H.L.O.'s other children, despite a no-contact order, and visitation reverted to supervised.

As to her older children, Mr. King stated they had been adjudicated neglected and removed from H.L.O.'s home but had since been returned to H.L.O.'s custody. In October 2017, H.L.O. regained custody of her oldest child, T.J.C., and in November 2018, H.L.O. regained custody of S.C. after the relative who had custody of him passed away. On cross-examination, H.L.O.'s counsel took issue with the October date for T.J.C.'s return, arguing records indicated T.J.C. was returned to H.L.O.'s home as early as July 2017 under a temporary order. The trial court never made a specific finding of fact on this issue.

Mr. King then testified to E.R.-L.O.'s current physical, mental, and emotional health. Mr. King stated that she was physically healthy though she had issues at birth with stiffness in her leg muscles, trembling episodes, and other physical symptoms. E.R.-L.O. remained in the hospital more than a week after her birth to wean her off medications. He said E.R.-L.O.'s condition had improved in foster care. She had her own room at her foster parents' house,

and they planned to adopt her. H.L.O. lived in a one-bedroom home, and she slept in the living room. The older children had bunk beds in the bedroom along with a crib. If E.R.-L.O. were to return to H.L.O., she would have to sleep in the bedroom with her brothers or in the living room with H.L.O., though H.L.O. had told Mr. King she was looking for a bigger place to live.

Mr. King based his recommendation that H.L.O.'s parental rights be terminated on the length of time it took her to make progress on her case plan. It took her much longer than usual to complete the Advancing Solutions program. E.R.-L.O.'s significant bond with the foster parents was also a key factor. While acknowledging E.R.-L.O. recognized H.L.O. and her siblings, in Mr. King's opinion, removing her from the only home she had ever known represented a substantial risk to her emotional health. When asked if there was a reasonable expectation of improvement in H.L.O.'s ability to provide for E.R.-L.O.'s care in the immediately foreseeable future, Mr. King stated H.L.O. had no income outside of cleaning homes for people. However, she did have her driver's license back, as well as a car. As far as being able to provide for E.R.-L.O., he said he believed she would be able to manage food and clothing.

On cross-examination, Mr. King said his primary concern was the emotional effect another relapse by H.L.O. would have on E.R.-L.O. He noted that due to her repeated relapses it took H.L.O. ten months to complete the Advancing Solutions program, which was unusually long. However, he acknowledged that she completed Phases 2 and 3 in two to three months each, which was more typical progression in the program. He also acknowledged that

after she graduated from the program in July 2017, she participated in the aftercare program for three or four months. She completed the KVC program in her home and the UK TAP program, and her driver's license had been reinstated. Ultimately, she had completed what the Cabinet asked her to do, even if it was untimely.

When asked why E.R.-L.O. was placed in foster care while the Cabinet placed her siblings with family members, Mr. King testified that E.R.-L.O. lacked a suitable relative for placement. When the Cabinet removed E.R.-L.O., H.L.O. provided the Cabinet names of relatives for possible placement. The Cabinet's investigation found none to be appropriate for placement, and this fact resulted in E.R.-L.O.'s case taking a different path than that of her siblings. When asked about H.L.O.'s July 2017 motion to change the goal back to reunification, Mr. King stated he did not have such a motion in his files and had no recollection of the motion or any subsequent hearing. When asked why it took the Cabinet more than a year from the goal change order to file a termination proceeding, Mr. King stated he did not know why it took so long for the Cabinet to file the actual TPR. He agreed that E.R.-L.O.'s extended time in foster care negatively affected her bond with H.L.O. while causing her to bond more strongly with her foster parents. He agreed that H.L.O. celebrated holidays and birthdays with E.R.-L.O. every year. When asked whether H.L.O. had improved, he acknowledged that she had improved since beginning the Cabinet's plan.

9

On redirect examination, Mr. King again stated that it was appropriate, and in E.R.-L.O.'s best interests, to terminate H.L.O.'s rights, even though the Cabinet had returned her two older siblings. He cited the length of time E.R.-L.O. had been in foster care and the fact it was the only home she had known. There was no promise that integration into H.L.O.'s home would succeed. He also stated that he had not agreed with the Cabinet's return of the other two children. Further, he pointed out that H.L.O. had not done anything to bring her motion to change the permanency goal before the district court again.

The Cabinet also called Adam Maggard, a clinician/therapist from Advancing Solutions, as a witness. He described Advancing Solutions as a structured program for women with substance abuse problems consisting of three phases and an aftercare program. Phase 1 consisted of 36 group meetings and required at least three months to complete. H.L.O. took ten months to complete this phase. Phase 2 consisted of 16 group meetings held two times per week and required at least two months to complete. Phase 3 required attendance at eight group meetings and at least two months to complete. The aftercare program is less structured and does not require group meetings but consists of two individual meetings per month, for six months with a counselor. Mr. Maggard stated he began working with H.L.O. in March 2016. He did individual and group therapy with her, and their last meeting was approximately a year earlier on February 1, 2018.

After the Cabinet closed its case, H.L.O. testified. H.L.O. testified that she felt she had no problems bonding with E.R.-L.O. E.R.-L.O. knew who H.L.O.

10

was and referred to her as "Mommy." E.R.-L.O. also knew her brothers, calling them "bubby." She emphasized she had asked Mr. King for additional visitation but did not get any and was told such a decision was up to the court. She filed the motion to redocket in the district court after the goal change but saw nothing change and never received an order with a decision.[4] She testified that she regularly attended hearings and reviews. She asked about increased visitation and/or custody each time and felt the Cabinet had failed to take adequate steps to reunify the family.

H.L.O. admitted she had substance abuse issues when E.R.-L.O. was removed, but she was currently living a clean and sober lifestyle. She had a prescription for Suboxone and was working with her counselors to taper off. She had maintained this lifestyle for the last year and a half to two years. She admitted that she had taken Suboxone without a prescription in the past and had a relapse involving Percocet.

Addressing her ability to care for E.R.-L.O., H.L.O. indicated she had income from KTAP benefits, a gas check, and S.C.'s Social Security (SSI) benefits. She stated J.H. helped financially. She said J.H. lived with them and that they were moving the following week to a larger home. She indicated J.H.'s criminal matters had all been resolved. Although she was currently unemployed, she had worked briefly at McDonald's and had previously earned

---

[4] As previously noted, there was no indication in the record that the district court ever ruled on the motion to redocket. The video record included no file of an August 1, 2017 hearing avowed to by H.L.O.'s counsel.

11

about $150 every other week by cleaning a friend's house. She quit her job when S.C. returned to her home because he had autism and needed her attention. Additionally, her sporadic work history after E.R.-L.O.'s birth was partially attributable to her pregnancies during portions of that time and not wanting to work because her pregnancies were high-risk.[5] H.L.O. did not believe it would be hard to provide care for E.R.-L.O. if E.R.-L.O. was transitioned to H.L.O.'s home and believed she had sufficient resources to provide for E.R.-L.O.

At the time of the hearing, H.L.O. lived in a one-bedroom home with the older children in the bedroom, and she and J.H. slept in the living room. She said that while J.H. lived there, he was never home due to his work schedule. When asked by the Cabinet, H.L.O. stated that she would feel comfortable leaving E.R.-L.O. with J.H. if she needed to run an errand.

At the conclusion of all testimony, the Cabinet argued that it had met the statutory burden for TPR. The Cabinet argued H.L.O.'s continued relationship with J.H. was problematic. While subsequent DNA testing had eliminated J.H. as the biological father, at the case initiation while he was still presumptively the father, the Cabinet had offered J.H. services. He refused and had not completed any services offered by the Cabinet at the time of the hearing. Mr. King testified that as part of S.C.'s case plan there was an order that J.H. was not to be alone with the children, yet H.L.O. admitted he was living in the home

---

[5] During the period between E.R.-L.O.'s birth and the hearing, H.L.O. was pregnant twice and miscarried each time.

12

and she would be comfortable leaving E.R.-L.O. with him as needed. The Cabinet further argued H.L.O. had not been supporting E.R.-L.O. as directed by the court, as evidenced by her child support arrearage, and there was no reasonable expectation that she would be capable of providing sufficient support in the future. E.R.-L.O. had been in the Cabinet's custody all three years of her life, and the Cabinet stated it was in E.R.-L.O.'s best interests to terminate H.L.O.'s parental rights and permit E.R.-L.O. to stay in her foster home, which was safe and nurturing and the only one she had known.

H.L.O. argued that the Cabinet had not met its burden. This case was about parental rights, not custody. The issue before the court was not whether E.R.-L.O. would be better in one home rather than another. H.L.O. argued the return of her older children to her custody indicated that she had satisfied any concerns the district court had at the time of the goal change and should have satisfied the trial court that TPR was unwarranted. She had taken proactive steps to get the goal changed back to reunification. She attended the weekly visitations and completed all services recommended by the Cabinet. She was currently living a sober lifestyle.

When asked by the court, E.R.-L.O.'s guardian *ad litem* (GAL) stated he believed the Cabinet had failed to meet its burden, particularly in light of the fact that H.L.O. now had custody of both of the older children, and therefore

13

termination was not appropriate in this case. He thought this was true even after hearing about J.H.'s presence in the home.[6]

On February 12, 2019, the circuit court entered its findings of fact and conclusions of law that E.R.-L.O. had been neglected and abused. KRS[7] 625.090(1). The court made further findings that H.L.O. had abandoned her child for more than ninety days, KRS 625.090(2)(a), and had failed or refused to provide essential parental care and protection and there was no reasonable expectation of improvement. KRS 625.090(2)(e). The trial court also found that for reasons other than poverty alone, H.L.O. failed to provide essential food, clothing, medical care, or education necessary for the child's well-being and there was no reasonable expectation of improvement in the immediately foreseeable future, considering the age of the child. KRS 625.090(2)(g). The court said that despite her completion of the Cabinet's services, those services failed to remediate H.L.O.'s lack of protective capacity as demonstrated by her willingness to expose her minor child to J.H. The trial court also found that E.R.-L.O. had been in the custody of the Cabinet for more than fifteen (15) of the last forty-eight (48) months. KRS 625.090(2)(j). A separate judgment was entered terminating H.L.O.'s parental rights and placing custody of E.R.-L.O. with the Cabinet with authority to place her for adoption.

---

[6] At the conclusion of arguments, the court asked the GAL for his "thoughts." The GAL offered his opinion that the state had failed to meet its burden to justify termination. The GAL never explicitly offered, nor was he specifically asked, his opinion as to what would be in E.R.-L.O.'s best interests.

[7] Kentucky Revised Statutes.

H.L.O. moved the court to alter, amend, or vacate its order pursuant to Kentucky Rules of Civil Procedure (CR) 52.02, 52.04, and 59.05, and for CR 60.02 relief. She argued that there was no evidence that she had abandoned E.R.-L.O., and that there was no evidence to support the other findings under KRS 625.090(2). She argued the trial court's focus on J.H.'s criminal record was inappropriate. The Cabinet conceded H.L.O. had not abandoned E.R.-L.O. but disputed H.L.O.'s remaining arguments. The Cabinet maintained that despite completing her services, H.L.O. showed a failure to internalize their lessons by continuing to permit J.H. to remain around her children, which would include E.R.-L.O. if she were returned. This fact indicated she could not apply what she learned in the services. At the hearing, the court stated that the case hinged on whether H.L.O. had complied with services and on her continued relationship with J.H. The court renewed its findings regarding H.L.O.'s insufficient progress on her case plan and her willingness to permit J.H. to be around E.R.-L.O., both of which justified the termination of her parental rights. The court ultimately granted in part and denied in part H.L.O.'s motion. It entered amended findings of fact and conclusions of law on April 4, 2019, removing the finding that H.L.O. had abandoned E.R.-L.O., but reiterated its other findings and conclusions and terminated H.L.O.'s parental rights.

H.L.O. appealed, and a divided Court of Appeals reversed the trial court, holding the Cabinet failed to meet its burden. The Court of Appeals focused on Mr. King's statements that H.L.O. had made progress since starting her

15

services. The Court of Appeals' review of Mr. King's testimony led it to the conclusion that Mr. King's recommendation to terminate H.L.O.'s parental rights was principally due to the time E.R.-L.O. had lived with the foster parents and the emotional difficulty of transitioning her to H.L.O.'s custody rather than the factors in KRS 625.090(2). The Court of Appeals also took issue with the trial court's focus on J.H. because he was not E.R.-L.O.'s biological father and was not married to H.L.O., despite living in the home. Therefore, the Court of Appeals disagreed with the trial court's finding that H.L.O.'s continued association with J.H. demonstrated an inability to adequately protect E.R.-L.O. They agreed with H.L.O. that the record did not show by clear and convincing evidence that there was no reasonable expectation of improvement in H.L.O.'s conduct and that the trial court's findings under KRS 625.090(2)(e) and (g) were incorrect.

The Court of Appeals then turned to the remaining factor under KRS 625.090(2), E.R.-L.O.'s lengthy time in foster care. It acknowledged that E.R.-L.O.'s time in the custody of the Cabinet, i.e. more than fifteen (15) of the prior forty-eight (48) months in foster care, satisfied the requirement of KRS 625.090(2)(j).[8] However, the Court of Appeals identified two mitigating factors that made this application unjust. First, the Cabinet never adequately explained the lengthy delay between the March 2017 goal change to adoption and the filing of the petition for termination in May 2018. Second, H.L.O. filed a

---

[8] At the time of the termination hearing, E.R.-L.O. was almost three years old and had lived her entire life with the foster parents.

motion in July 2017 to change the goal back to reunification that was never ruled upon by the district court. The Court of Appeals then stated that despite meeting the statutory definition, "we do not believe this circumstance should be held against the Mother in this case." The Court of Appeals reversed the circuit court, finding none of the factors in KRS 625.090(2) were established by clear and convincing evidence. Therefore, the circuit court's decision to terminate was clearly erroneous.

The Cabinet appealed to this Court, arguing the Court of Appeals misinterpreted the custody provision of KRS 625.090(2)(j) and failed to give sufficient deference to the trial court's findings under KRS 625.090(2)(e) and (g).

### STANDARD OF REVIEW

Broad discretion is afforded to trial courts to determine whether parental rights should be terminated, and our review is limited to a clearly erroneous standard. *Cabinet for Health & Family Servs. v. K.H.*, 423 S.W.3d 204, 211 (Ky. 2014). A trial court's findings are not clearly erroneous if there is substantial evidence in the record to support them. *L.D. v. J.H.,* 350 S.W.3d 828, 829-30 (Ky. App. 2011) (citing *Reichle v. Reichle*, 719 S.W.2d 442, 444 (Ky. 1986)). When the findings are supported by substantial evidence, then appellate review is limited to whether the facts support the legal conclusions which we review de novo. *Id.* at 830. If the trial court's factual findings are not clearly erroneous and the legal conclusions are correct, we are limited to determining whether the trial court abused its discretion in applying the law to the facts. *Id.* Finally,

17

[s]ince the family court is in the best position to evaluate the testimony and to weigh the evidence, an appellate court should not substitute its own opinion for that of the family court. If the findings of fact are supported by substantial evidence and if the correct law is applied, a family court's ultimate decision ... will not be disturbed absent an abuse of discretion.

*B.C. v. B.T.*, 182 S.W.3d 213, 219 (Ky. App. 2005) (internal citations omitted).

The termination of parental rights is a particularly fact-sensitive inquiry, so appellate courts are disinclined to disturb a trial court's findings. *K.H.*, 423 S.W.3d at 211. Where the trial court's findings are not clearly erroneous, and they substantially support the TPR, we will affirm the order. *Id.* "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent minded people." *Rowland v. Holt*, 70 S.W.2d 5, 9 (Ky. 1934).

## ANALYSIS

It is a fundamental right of every parent to raise his or her own child. *K.H.*, 423 S.W.3d at 209.[9] KRS 625.090 sets forth all the requirements which must be met before a court in Kentucky can involuntarily terminate a parent's rights to his or her child. Because of the heightened value of the right to parent a child, such proof must be clear and convincing in nature. *Santosky v.*

---

[9] *See also Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972) (protecting a parent's right to control the rearing, education, and religion of his or her child); *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (holding the right to raise a child is a "basic civil right" of a parent).

18

*Kramer*, 455 U.S. 745, 747-48 (1982). The statute requires the court to find three critical elements. First, the court must find that the child has been found to have been abused or neglected by a court of competent jurisdiction. KRS 625.090(1). Second, the court must find at least one of the eleven enumerated grounds for termination exists. KRS 625.090(2). Lastly, even if the Cabinet establishes both of these elements, the court must still determine that termination is in the child's best interest. KRS 625.090(1)(c).

### A. Substantial evidence supported the trial court's finding the child was in the custody of the Cabinet for fifteen of the preceding forty-eight months.

KRS 625.090(2) enumerates eleven factors that justify a termination of parental rights. One such factor, KRS 625.090(2)(j), states, "[t]hat the child has been in foster care under the responsibility of the cabinet for fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights."[10] It is uncontroverted that E.R.-L.O. was approximately twenty-seven (27) months old at the time the Cabinet filed the petition for termination in May 2018 and had been in foster care her entire life. By the plain reading of the statute, E.R.-L.O. had been in the Cabinet's custody for twenty-seven (27) months at the time of the petition's filing.

---

[10] At the time of the Cabinet's filing of the termination proceeding, KRS 625.090(2)(j) required that the child had been in foster care for fifteen (15) of the most recent twenty-two (22) months. The 2018 Ky. Acts (effective July 14, 2018) revised the requirement to a cumulative fifteen (15) of the preceding forty-eight (48) months. The issue in this case is whether E.R.-L.O. was in the Cabinet's custody for fifteen (15) months, so the change to the relevant timeframe does not affect our consideration.

The Court of Appeals held that the circumstances of this case made it inappropriate to apply this statutory ground for termination. Without explanation, the Court of Appeals used the June 6, 2016 disposition hearing as the start of the Cabinet's custody for the statute's purposes instead of using the date the Cabinet was first granted emergency custody of E.R.-L.O. It also gave consideration to the fact that H.L.O.'s July 27, 2017 motion to redocket the case was filed within fifteen months of that disposition date. Because the district court did not rule on the motion and the Cabinet delayed filing the TPR without any explanation, the Court of Appeals stated, "[w]hile technically [the trial court's finding under KRS 625.090(2)(j)] is supported by clear and convincing evidence, we do not believe this circumstance should be held against the Mother in this case." For this reason, it disagreed with the trial court's finding under KRS 625.090(2)(j).

The Cabinet argues the Court of Appeals erred in its understanding of custody for purposes of the statute, and we agree. "Our goal in construing each statute is to give effect to its plain meaning and unambiguous intent without rendering any part meaningless." *A.H. v. Louisville Metro Gov't*, 612 S.W.3d 902, 908 (Ky. 2020) (citing *Commonwealth v. Tapp*, 497 S.W.3d 239, 241 (Ky. 2016); *Bob Hook Chevrolet Isuzu, Inc. v. Commonwealth Transp. Cabinet*, 983 S.W.2d 488, 490-92 (Ky. 1998)). When previously faced with the question of when a child is in the Cabinet's custody for purposes of KRS 625.090, courts have used a simple test of determining when the first order granting the

Cabinet custody was entered.[11] The language of KRS 625.090(2)(j) is that the child is "in foster care under the responsibility of the cabinet[.]" Nothing in its language indicates that the timeframe in question only commences once the child is "committed" to the custody of the Cabinet at a disposition hearing as the Court of Appeals implicitly required. We hold the Letcher District Court's grant of emergency custody on February 26, 2016, represents the beginning of E.R.-L.O.'s custody with the Cabinet for purposes of KRS 625.090(2)(j).

Likewise, we can find no language in the statute or prior precedent that constructively tolls the "clock" when a parent files a motion to review a goal change. The statute simply requires that the child be in foster care for "fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights." KRS 625.090(2)(j). The goal of the statute is to prevent children from lingering in foster care. *Commonwealth, Cabinet for Health & Family Servs. v. T.N.H.*, 302 S.W.3d 658, 664 (Ky. 2010) (citing *Cabinet for Families & Children v. G.C.W.*, 139 S.W.3d 172, 177 (Ky. App. 2004)). When the correct date of February 26, 2016 is applied to the statute, it is clear E.R.-L.O. had been in the custody of the Cabinet for twenty-seven (27) months at the time of the Cabinet's petition to terminate parental rights. Therefore, for purposes of KRS 625.090(2)(j), the trial court correctly

---

[11] *See, e.g.*, *Cabinet for Health & Family Servs. v. K.S.*, 585 S.W.3d 202 (Ky. 2019) (affirming trial court's finding that child was in foster care from initial placement with the Cabinet); *K.H.*, 423 S.W.3d 204 (Ky. 2014) (calculating time in Cabinet custody from initial removal hearing); *B.E.H.H. v. Cabinet for Health & Family Servs.*, No. 2019-CA-000382, 2020 WL 1074783 (Ky. App. March 6, 2020) (calculating time in Cabinet custody from first Emergency Custody Order).

found that she had been in the custody of the Cabinet for fifteen (15) of the prior forty-eight (48) months.

Like the Court of Appeals, we are concerned that the Cabinet took fourteen (14) months to file the TPR action after the district court changed E.R.-L.O.'s permanency goal. Such a substantial delay runs directly counter to the statute's purpose of establishing permanence for children and is particularly problematic when services cease for the parent before final adjudication of their parental rights. While such a delay does not change the statutory calculation of the time the child is in foster care, we strongly suggest the trial court should consider it when determining whether the Cabinet has made reasonable efforts to reunite the family and in its balance of the child's best interests.

## B. The trial court's findings under KRS 625.090(2)(e) and (g) were not clearly erroneous.

The trial court is the finder of fact, and unless clearly erroneous, we will affirm a TPR order. *M.A.B. v. Commonwealth, Cabinet for Health & Family Servs.*, 456 S.W.3d 407, 411 (Ky. 2015). The Letcher Circuit Court heard testimony from the Cabinet and H.L.O. herself and found justification for terminating H.L.O.'s parental rights under KRS 625.090(e) and (g), and that such termination was in E.R.-L.O.'s best interests. KRS 625.090 (e) and (g) state in their entirety:

> (e) That the parent, for a period of not less than six (6) months, has continuously or repeatedly failed or refused to provide or has been substantially incapable of providing essential parental care and protection for the child and that there is no reasonable expectation

22

of improvement in parental care and protection, considering the age of the child;

(g) That the parent, for reasons other than poverty alone, has continuously or repeatedly failed to provide or is incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the child's well-being and that there is no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future, considering the age of the child[.]

The Court of Appeals reversed the circuit court based principally on the statement by Mr. King that H.L.O. had improved since the start of her plan. It extrapolated from this statement of past improvement that the trial court must accept that there was a reasonable expectation of improvement into the future. In doing so, the Court of Appeals ignored the vast preponderance of Mr. King's testimony, H.L.O.'s testimony, and the trial court's recitation of its findings from that testimony.

Specifically, Mr. King testified to H.L.O.'s arrearage in child support and the fact that despite her improvement, he did not believe she would be able to care for E.R.-L.O. He stated that while the court returned T.J.C. and S.C. to H.L.O., in his professional opinion, that decision was incorrect in light of H.L.O.'s conduct and J.H.'s involvement in her life. He stated the Cabinet's decision to support the return of the older children was likely because they were placed with relatives rather than in foster care.

In H.L.O.'s testimony, she acknowledged she had limited resources, was not working, and relied on S.C.'s SSI and J.H.'s help to provide for housing and other needs. She said if E.R.-L.O. came home with her, E.R.-L.O. would likely sleep in the room with H.L.O. and J.H., though she did state they were in the

23

process of getting a larger home. Perhaps most importantly, she testified she would have no issue leaving E.R.-L.O. with J.H. should the need arise.

The Court of Appeals noted J.H. is not the child's biological father and summarily discounted the trial court's concerns regarding J.H. A review of the record indicates the trial court's concern regarding J.H. appropriately impacted its findings in three ways. First, H.L.O.'s willingness to bring E.R.-L.O. back into a home with J.H. demonstrated a lack of protective capacity and directly countered her argument she had improved. It also called into question her ability to make decisions in the best interest of E.R.-L.O. where J.H. was concerned and whether there was a "reasonable expectation of improvement" under KRS 625.090(2)(e).

Second, H.L.O.'s financial dependence on J.H. was sufficient for a person of ordinary prudence to question whether H.L.O. was in a position to support E.R.-L.O. or would be in the immediately foreseeable future. H.L.O. cannot argue on the one hand that because J.H. is not the father, he should not be a factor in the court's evaluation of her fitness under KRS 625.090(2)(e) and (g) and then depend upon him for his financial support to care for E.R.-L.O. The trial court was also aware that despite J.H.'s financial support and a relatively modest child support requirement of $100 per month, H.L.O. had an arrearage of more than $1,300 at the time of the hearing. All these factors were available to the court in determining whether there was "no reasonable expectation of significant improvement in the parent's conduct in the immediately foreseeable future."

Lastly, even when the court finds a factor under KRS 625.090(2), that is only the first step. The court must also find it is in the child's best interest to terminate the parental rights. J.H.'s presence in the home and future involvement in H.L.O.'s life was a valid consideration under KRS 625.090(3)(d) as part of H.L.O.'s conduct and circumstances. Therefore, we hold the Letcher Circuit Court's termination of H.L.O.'s parental rights was supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, we reverse the Court of Appeals' opinion and reinstate the Letcher Circuit Court's termination order.

All sitting. All concur.


COUNSEL FOR APPELLANT, COMMONWEALTH OF KENTUCKY, CABINET FOR HEALTH AND FAMILY SERVICES:

Zachary G. Ousley

COUNSEL FOR APPELLANT, E.R.-L.O., A MINOR CHILD:

Jameson Dean Combs

COUNSEL FOR APPELLEE:

Tammy C. Skeens
Herman W. Lester, PSC