RENDERED: FEBRUARY 7, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0162-ME

R.D.H.          APPELLANT

APPEAL FROM WARREN CIRCUIT COURT
FAMILY COURT DIVISION
v.          HONORABLE DAVID A. LANPHEAR, JUDGE
ACTION NO. 23-AD-00042

COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; M.D.S.H., A
MINOR CHILD; AND J.R.H.H.          APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, L. JONES, AND McNEILL, JUDGES.

JONES, L., JUDGE: R.D.H.[1] ("Father") appeals from a January 28, 2024 judgment of the Warren Circuit Court, Family Court Division (family court) terminating his parental rights to minor child, M.D.S.H. ("Child"). In that same order, the family court also terminated the parental rights of J.R.H.H. ("Mother"). Mother has not appealed that judgment. In accordance with *A.C. v. Cabinet for Health and Family Services*, 362 S.W.3d 361 (Ky. App. 2012), Father's counsel filed an *Anders*[2] brief conceding that no meritorious assignment of error exists to present to this Court. Father's counsel accompanied the brief with a motion to withdraw which was passed to this merits panel. By separate order, we have granted counsel's motion to withdraw.

Father filed a *pro se* brief as well as a *pro se* reply brief in response to the Cabinet's brief. As all briefs have been filed, we must "fully examine the record and decide whether the appeal is wholly frivolous." *A.C.*, 362 S.W.3d at 371. Having independently reviewed the record, as well as having fully considered the briefs, we affirm the family court's opinion.

---

[1] To protect the privacy of the minor child, we will refer to the child and her natural parents by their initials or "Father," "Mother," and "Child" rather than their names.

[2] *Anders v. California*, 386 U.S. 738 (1967).

## FACTUAL AND PROCEDURAL HISTORY

The events giving rise to this case happened on March 9, 2020, when Child was eight years old. On that day, during a dispute with Child about being ready for the school bus, Mother kicked Child, causing her body to strike a door and then Mother pushed Child out the door. Child reported this to her bus driver and to her school. During a criminal investigation, it was discovered that Mother had warrants for her arrest and those were executed. On March 17, 2020, the family court entered an Emergency Custody Order placing Child in the custody of the Cabinet for Health and Family Services ("Cabinet") where she remained during the pendency of this case. Father was incarcerated at the time of this incident, serving a fifteen-year sentence of imprisonment.[3]

Case plans were drafted for both Mother and Father. Because Mother has not appealed the family court's judgment, we need not discuss Mother's case plan; it is enough to say that she did not follow through with its requirements.

Father's case plan involved completing both mental health and substance abuse assessments, following through with recommendations from those assessments, and obtaining and maintaining stable employment and housing. While

---

[3] Certified records introduced at the termination hearing showed that on January 22, 2020, Father was sentenced to ten years for one count of Trafficking in a Controlled Substance in the First Degree, First Offense, Equal to or Greater than 2 Grams of Methamphetamine and sentenced to five years on one count of Trafficking in a Controlled Substance in the First Degree, First Offense, Less than 2 Grams of Methamphetamine. Both sentences were to run consecutively for a total fifteen-year sentence.

those tasks would largely have to wait until his release from imprisonment, Father participated in numerous "Moral Recognition Therapy" ("MRT") programs as well as obtained his General Educational Development diploma ("GED "). Neither of these tasks were part of his case plan. Father also wrote many letters to Child and had regular telephone contact with her. Father remained incarcerated throughout the entirety of the time between Child's removal and the final termination of parental rights ("TPR") hearing.

The final TPR hearing took place on December 13, 2023. Father was still incarcerated at the time of the hearing but was present in person with counsel. Mother was not present. Only one witness testified, Cabinet social worker, Ashley Riddle. Ms. Riddle testified about the circumstances that brought Child into the custody of Cabinet, the case plans developed for each parent,[4] the progress of each parent on their respective case plans, and Child's progress while placed in Cabinet care.

Ms. Riddle testified that while most of Father's tasks would have to wait until his release,[5] she acknowledged that Father had participated in many

---

[4] It appears the case plans were not introduced as separate exhibits at the TPR hearing. The only evidence this Court can find in the record of a case plan for Father (other than Ms. Riddle's testimony) comes from a letter by Father to the family court dated March 16, 2022, in the underlying juvenile case (No. 20-J-00192-1). In that letter, Father stated that he received a copy of the case plan on December 28, 2021, and attached a copy of that case plan with his letter. That case plan is signed by Father (but not the Cabinet) and contains Father's handwritten notations.

[5] Those tasks listed on the case plan referenced in n.4, *supra* (without Father's notations), are:

MRT programs and praised Father for receiving his GED. Ms. Riddle also

acknowledged that Father had maintained regular phone contact with Child and

Objective: To address the issues that lead to the removal of the children

1. [Father] agrees not to use physical discipline with the children.

2. [Father] will participate in parenting classes and follow all recommendations.

3. [Father] will demonstrate parent skills learned in class while visiting the children once released from Jail. [sic]

Objective: to address issues of substance abuse.

1. [Father] will complete a substance abuse assessment and follow the recommendations upon his release from jail.

2. [Father] will submit to random drug screens at the request of the cabinet. Any missed test is considered a possible positive and all tests must be observed.

3. [Father] will attend AA/NA 3 times weekly and keep a journal of meetings and attendance. This journal can include topics of discussion and take aways.

Objective: to follow all court orders.

1. [Father] will follow all court orders and [Cabinet] recommendations upon his release.

2. [Father] will comply with probation and parole upon his release.

3. [Father] will refrain from further criminal activity.

Objective: to ensure safety and stability for the children.

1. [Father] will obtain and maintain stable housing. This means six months of residing in the same home.

2. [Father] will provide SSW with proof of employment.

3. [Father] will maintain a stable income.

had written her numerous letters. Ms. Riddle further acknowledged that both Father and Child were attached to each other.

Despite their attachment, Ms. Riddle testified there would be significant challenges to reunification. Not only would many tasks on Father's case plan have to wait until his release, but at the time of the hearing, Father's release date was still an open question. Father expected to be *eligible* for parole sometime in 2024 but had not yet been *granted* parole.[6] Ms. Riddle testified that even if he were released on parole in 2024, he would still face an "uphill battle" before Child could be placed in his custody. Ms. Riddle testified that even with Father's self-improvements in prison, given his history, she would expect that he would need to attend drug and alcohol group meetings, submit to drug screens, seek mental health therapy, and maintain stable housing for at least six months following his release. Further complicating any attempts to obtain housing and employment would be the fact that Father is a registered sex offender with a lifetime registration requirement.[7]

Ms. Riddle acknowledged the connection between Father and Child and acknowledged that termination would be hard on Child but testified that Child

---

[6] In his Reply Brief, filed August 20, 2024, Father stated that he met with the Parole Board in July, 2024 and that he "is scheduled for release any day."

[7] The conviction that led Father to being a lifetime registrant did not involve Child and occurred before Child was born. No certified record of that conviction was offered as an exhibit at the TPR hearing, but Father acknowledges the conviction in his *pro se* brief.

deserved permanency. Ms. Riddle testified that Child had been in "chaotic and unpredictable situations her entire life." Ms. Riddle testified that even if Father were released from prison in the next year, Child would have already been in cabinet care for four years and Child would have to wait even longer for Father to become stable enough that the Cabinet would recommend returning Child to his care. Ms. Riddle also testified that she was confident Child's therapy team would be able to address Child's disappointment if Father's parental rights were terminated.

On January 8, 2024, the Circuit Court entered an order, along with findings of fact and conclusions of law, terminating the parental rights of both Mother and Father. From that order, Father filed a timely appeal.

## STANDARD OF REVIEW

Kentucky Revised Statute ("KRS") 625.090 governs TPR. Before parental rights may be terminated under that statute, the family court must find by clear and convincing evidence that a tripart test has been satisfied: "(1) the child is found or has been adjudged to be an abused or neglected child as defined by KRS 600.020(1); (2) termination of the parent's rights is in the child's best interests; and (3) at least one of the termination grounds enumerated in [KRS 625.090(2)(a)-(k)] exists." *Cabinet for Health and Fam. Services v. K.H.*, 423 S.W.3d 204, 209 (Ky. 2014).

As observed by a prior panel of this Court in *M.E.C. v. Cabinet for Health and Family Services*, 254 S.W.3d 846, 850 (Ky. App. 2008):

> [A]lthough termination of parental rights is not a criminal matter, it encroaches on the parent's constitutional rights to parent his or her child, and therefore, is a procedure that should only be employed when the statutory mandates are clearly met. While the state has a compelling interest to protect its youngest citizens, state intervention into the family with the result of permanently severing the relationship between parent and child must be done with utmost caution.

Even so, "[b]ecause termination decisions are so factually sensitive, appellate courts are . . . loathe [sic] to reverse them, regardless of the outcome." *D.G.R. v. Cabinet for Health and Fam. Services*, 364 S.W.3d 106, 113 (Ky. 2012). Indeed, "[t]his Court's standard of review in a termination of parental rights action is confined to the clearly erroneous standard in [Kentucky Rules of Civil Procedure] 52.01 based upon clear and convincing evidence[.]" *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 116 (Ky. App. 1998). In reviewing whether the family court's factual findings are clearly erroneous, this Court looks at "whether or not those findings are supported by substantial evidence." *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). "Substantial evidence" means "evidence that a reasonable mind would accept as adequate to support a conclusion and evidence that when taken alone or in the light of all evidence, has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* "[T]he

findings of the [family] court will not be disturbed unless there exists no substantial evidence in the record to support its findings." *M.P.S.*, 979 S.W.2d at 116. Furthermore, "[t]he [family] court has a great deal of discretion in determining whether the child fits within the abused or neglected category and whether the abuse or neglect warrants termination." *Id.*

That being said, the best interest of the child prong of the tripart test is reviewed for abuse of discretion. *D.J.D. v. Cabinet for Health and Fam. Services*, 350 S.W.3d 833, 837 (Ky. App. 2011). "Absent a showing that a decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles, a [trial] court's determination [regarding best interests of the child] will not be an abuse of discretion and will be sustained." *Id.*

With these principles in mind, we turn to Father's arguments.

## ANALYSIS

In his *pro se* brief, Father contends that the evidence presented at the termination hearing fails to establish any prong of the tripart test for termination of parental rights under KRS 625.090 and ultimately that termination was wrongly based solely on his incarceration. We will examine each prong in turn.

### *Whether Child is an Abused or Neglected Child*

While noting that there were several findings as to abuse or neglect regarding *Mother*, Father contends in his supplemental brief that there was no

evidence presented at the termination hearing that he *himself* "abused or neglected" Child per KRS 600.020(1). Father further argues that while "his incarceration temporarily limits his ability to provide essential needs for his child, it (incarceration) in no way concludes he does not love and care for his child, or that he abused or neglected his child." Father further argues that the family court's finding that he had "not made sufficient progress towards the goals set forth in [his] case plan to allow for the safe return of child for fifteen (15) out of the last forty-eight (48) months" is erroneous as the "record will show that [Father] has actively pursued his case plan under the supervision of the Cabinet since emergency custody was awarded to the Cabinet."

Father's arguments in his supplemental brief suggest an intentional act of physical abuse or intentional abandonment of a child is required before a court may find that a child is an "abused or neglected child" under KRS 600.020(1). However, this Court must "interpret the statute according to the plain meaning of the act and in accordance with the legislative intent." *Commonwealth v. Plowman*, 86 S.W.3d 47, 49 (Ky. 2002). Intent to abuse or neglect a child is *not* a necessary element for a child to be adjudged an abused or neglected child. *Cabinet for Health and Fam. Services v. P.W.*¸ 582 S.W.3d 887, 895 (Ky. 2019). Nor does incarceration for reasons unrelated to the child's removal immunize a parent from a finding that he or she abused or neglected a child. *J.H. v. Cabinet for Human*

-10-

*Resources*, 704 S.W.2d 661, 664 (Ky. App. 1985) ("[A]bsence, voluntary or court-imposed, may be a factor to consider in determining whether [a child has] been neglected[.]")

In determining that Child was abused or neglected, the family court found as follows:

> Mother physically abused child. Mother stipulated to abuse/neglect in juvenile court. Parents have not provided essential parental care and protection for child. Parents have not provided child with adequate care, supervision, food, clothing, shelter, education, or medical care. Parents have not made sufficient progress toward the goals set forth in their case plans to allow for the safe return of child for fifteen (15) out of the last forty-eight (48) months.

Thus, the final three sentences in the family court's findings show that the family court found *both* parents abused or neglected Child through KRS 600.020(1)(a)4., KRS 600.020(1)(a)8., and KRS 600.020(1)(a)9. This prong of the tripart test is satisfied even if the family court correctly found only one of these subsections was met. KRS 625.080(1)(a).

We begin our review with the latter finding. It is true that Father's progress on his case plan was limited by his incarceration and that he did make progress towards self-improvement while incarcerated. However, KRS 600.020(1)(a)9. provides that abuse or neglect occurs when a parent "[f]ails to make *sufficient* progress toward identified goals as set forth in the court-approved case plan *to allow for the safe return of the child . . .* that results in the child

-11-

remaining committed to the cabinet and remaining in foster care for fifteen (15) cumulative months out of forty-eight (48) months[.]" (Emphasis added.) While it is commendable Father took classes while in prison, those were not enough to allow for the safe return of Child. Indeed, as Ms. Riddle testified many of the tasks on his case plan could not even begin until after his release from his fifteen-year sentence.

Even if Father's failure to make sufficient progress for Child's return was not intentional, that does not make him immune from KRS 600.020(1)(a)9. As stated, *supra*, intent is not a necessary element for most findings of abuse or neglect. As stated in *Cabinet for Health and Family Services v. K.S.*, 585 S.W.3d, 202, 213 (Ky. 2019), "KRS 600.020(1)(a)(9) does not contain an intent requirement." Thus, it does not matter whether a parent's failure to make sufficient progress on his or her case plan was willful; all that matters is that there was not sufficient progress. Because Father failed to make sufficient progress on his case plan to allow for Child's return (for whatever reason), and because it is undisputed that failure did not allow for Child to safely return to his care for fifteen cumulative months out of forty-eight months, the family court correctly found that Child was abused or neglected under KRS 600.020(a)9.

The family court's findings regarding KRS 600.020(1)(a)4. and KRS 600.020(1)8. are also supported by substantial evidence. KRS 600.020(1)(a)4. provides that neglect or abuse occurs when a parent "[c]ontinuously or repeatedly

fails or refuses to provide essential parental care and protection for the child, considering the age of the child[.]" In relevant part, KRS 600.020(1)(a)8. provides that neglect or abuse occurs when a parent "[d]oes not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being when financially able to do so or offered financial or other means to do so."

These subsections also do not require a finding of intent. *K.S.*, 585 S.W.3d at 213. Furthermore, a criminal lifestyle that leads to significant incarceration is sufficient to satisfy these subsections. *See D.W. v. Cabinet for Health and Fam. Services*, Nos. 2018-CA-001374-ME & 2018-CA-001375-ME, 2019 WL 2067365, at *4-5 (Ky. App. May 10, 2019) (affirming family court's findings that a parent engaging "in extensive criminal behavior that has led to multiple periods of incarceration lasting from a couple months to over a year at a time" and that parent's current incarceration together were sufficient to satisfy KRS 600.020(1)(a)4. and KRS 600.020(1)(a)8.).

In the present case, Father had commenced a fifteen-year sentence nearly two months before Child's removal to foster care; Father remained incarcerated during the entire pendency of the juvenile court proceedings; though Father hoped to receive parole in the year following the TPR hearing, parole was not a guarantee; even if Father received parole as he hoped, yet another additional

-13-

period of *at least* six months would be required for Father to demonstrate stable housing and employment, provided he was able to obtain both immediately upon release. If Father was not able to find housing or employment immediately upon his release, the period between release and reunification with Child would be even longer. Thus, the family court correctly found the child was abused or neglected under *both* KRS 600.020(1)(a)4. and KRS 600.020(1)(a)8.

### *Whether One of the Termination Grounds in KRS 625.090(2) Exists*

Before parental rights can be terminated, at least one of eleven statutory grounds under KRS 625.090(2) must be established by clear and convincing evidence. Father concedes that one of these grounds, KRS 625.090(2)(j) exists, *i.e.* "[t]hat the child has been in foster care under the responsibility of the cabinet for fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights[.]" However, Father argues the family court incorrectly applied the law because his incarceration cannot be the basis to satisfy this subsection. We disagree.

Just as we look at the plain language of the subsections of KRS 600.020(1) to determine whether intent is necessary for a finding of abuse or neglect, we look at the plain language of KRS 625.090(2)(j) to determine if any level of fault is necessary to support a finding under that subsection. Our Supreme Court has found that fault is not necessary. *Cabinet for Health and Fam. Services*

-14-

*v. H.L.O.*, 621 S.W.3d 452, 463-64 (Ky. 2021). In *H.L.O.*, the Kentucky Supreme Court found that "the statute simply requires that the child be in foster care for 'fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights.'" *Id.* at 464. There is nothing in the statute that provides circumstances to "[toll] the 'clock.'" *Id.* at 463-64. Indeed, "[t]he goal of the statute is to prevent children from lingering in foster care." *Id.* at 464. Because it is undisputed that Child has been in the foster care system for "fifteen (15) cumulative months out of forty-eight (48) months preceding the filing of the petition to terminate parental rights[,]" and because fault is not relevant to a finding under KRS 625.090(2)(j), the family court correctly found that at least one of the statutory factors under KRS 625.090(2) exists.

### *Best Interests of the Child*

Under the final prong of the tripart test, the family court must find that TPR is in the child's best interest. KRS 625.090(1)(c). KRS 625.090(3) provides six factors for the family court to consider:

> (a) Mental illness as defined by KRS 202A.011(9), or an intellectual disability as defined by KRS 202B.010(9) of the parent as certified by a qualified mental health professional, which renders the parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for extended periods of time;
>
> (b) Acts of abuse or neglect as defined in KRS 600.020(1) toward any child in the family;

-15-

(c) If the child has been placed with the cabinet, whether the cabinet has, prior to the filing of the petition made reasonable efforts as defined in KRS 620.020 to reunite the child with the parents unless one or more of the circumstances enumerated in KRS 610.127 for not requiring reasonable efforts have been substantiated in a written finding by the District Court;

(d) The efforts and adjustments the parent has made in his circumstances, conduct, or conditions to make it in the child's best interest to return him to his home within a reasonable period of time, considering the age of the child;

(e) The physical, emotional, and mental health of the child and the prospects for the improvement of the child's welfare if termination is ordered; and

(f) The payment or the failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so.

Father argues that the family court incorrectly concluded that termination would be in Child's best interest.[8] After examination of the record against the relevant factors of KRS 625.090(3), we disagree.

Regarding KRS 625.090(3)(b), while Father disagrees, as established, *supra*, Father is responsible for abuse and neglect regarding Child. Furthermore,

_____

[8] The family court did not specifically enumerate each subsection in its findings, but it is clear that the family court considered these factors. Indeed, even if the family court's written order does not specifically address each factor, it is enough if a trial court's findings "lead [the appellate court] to believe that each factor was properly considered." *K.H.*, 423 S.W.3d at 212. Except for KRS 625.090(3)(a) (which we agree with Father is not relevant) and KRS 625.090(3)(f), father does not argue that the trial court failed to consider these factors, only that the trial court's conclusions were incorrect.

while she did not elaborate, Ms. Riddle testified that Child was subject to a chaotic and unpredictable upbringing prior to being removed. Furthermore, Father's current and past incarceration show that Father has "pursued a [criminal] lifestyle incompatible with parenting." *J.H.*, 704 S.W.2d at 664.

Regarding KRS 625.090(3)(c), there is little that the Cabinet could do to reunify Father with Child while he remained incarcerated. Any programs or treatment would have to be arranged through the prison. And while the Cabinet could not place Child in Father's custody while he was incarcerated, the Cabinet did help maintain their bond through setting up telephone calls and arranging for letters to be exchanged. It is difficult to see what else the Cabinet could do while Father remained in prison.

Regarding KRS 625.090(3)(d), there is no dispute that Father took steps to improve himself while in prison and that he maintained a close bond with Child. While commendable, the family court was tasked to look at those efforts against whether Child could be returned to him "*within a reasonable period of time.*" At the time of the termination hearing, Father only had the *prospect* of parole of his fifteen-year sentence sometime in 2024; there was no guarantee of parole. Furthermore, Ms. Riddle testified that even upon release, it would take a *minimum* of six months of progress before Child could be returned to Father's

custody. Further complicating this progress would be Father's placement on the sexual offender registry, which would limit where he could live and work.[9]

Regarding KRS 625.090(2)(e), Ms. Riddle acknowledged the close bond between Father and Child and conceded that Child would have a hard time adjusting if termination was ordered. However, Ms. Riddle also testified that Child's therapy team would be able to help Child adjust. Furthermore, Ms. Riddle testified that Child needed and deserved permanency. Child had been in Cabinet custody for almost four years at the time of the termination hearing, nearly a third of her life. The best-case scenario would have required Child to wait at least another year for the mere hope of being returned to Father.

Finally, Father argues that the family court failed to consider his "payment or failure to pay a reasonable portion of substitute physical care and maintenance if financially able to do so" under KRS 625.090(3)(f). Father claims that he has been unable to pay for Child's maintenance due to his incarceration,[10] but "[p]ortions of his earned income is paid directly to the Cabinet on a monthly basis. These payments have been made to the Cabinet for approximately one year." This Court's review of the record does not reflect any testimony or documents

---

[9] KRS 17.545.

[10] In the underlying juvenile file, an Agreed Order Establishing Child Support and Medical Insurance was entered on July 24, 2020, where Father was ordered to pay $60.00 monthly for support and maintenance starting August 1, 2020.

regarding such payments, and this Court may not consider matters inside the record. *See Telek v. Daugherty*, 376 S.W.3d 623, 626 (Ky. App. 2012). Even assuming Father made such payments as he claimed, we do not believe such payments tip the balance in favor of overturning the family court's finding that termination was in Child's best interest.

Thus, when looking at the factors balanced together, we cannot say the family court abused its discretion when finding TPR was in Child's best interests.

## CONCLUSION

Like so many TPR cases in our Commonwealth, there are no winners here. There is a clear bond between Father and Child. However, while Father's incarceration certainly contributed to the findings of the family court, the family court did not merely recite incarceration as the basis for termination. This is an instance of a parent who had "not just been incarcerated for an isolated, minor criminal offense, but had committed multiple serious criminal offenses[.]" *A.R.D. Cabinet for Health and Fam. Services*, 606 S.W.3d 105, 112 (Ky. App. 2020). Furthermore, our task is not to determine whether this Court might have a different view of the evidence, but rather to evaluate whether the family court's findings were supported by substantial evidence and whether the family court abused its discretion in finding that TPR was in the best interests of Child. In that light, we

conclude that the family court did not err, and we AFFIRM the January 28, 2024 judgment of the family court terminating Father's parental rights.

ALL CONCUR.

BRIEFS FOR APPELLANT:

James C. Jones, II
Bowling Green, Kentucky

R.D.H., *pro se*
La Grange, Kentucky

BRIEF FOR APPELLEE:

Leslie M. Laupp
Covington, Kentucky